## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JEFFREY AUSTIN, Joan Austin, Johnella Bradford, Antrece Baggett, Ashley Britton-Picott, Adrian Brown, Cassandra Brown, Deliah Brown, Trina Campbell, Felicia Rucker-Carter, Hyginus Chukwu, Shirley Collins, Lisa Cooper, Ava Cosey, Marie Cromwell, Terrence Crosby, Marcus Curvey, Carolyn Davis, Karen Davis, Syble Davis, Linda Denkins, Brigette Dennis, Chameeta Denton, Antionette Dickson, Charles Drayden, Rosemary Edwards, Catina Eiland, Lorlie Ellis, Readri Epps, Micalyn Flagg, Rosalyn Francis, Geraldine Gibson, Brandy Griffin, Afrah Hassan, Avis Horde, Kim Ingram, Dawnica Jackson, Rodney Jackson, Troy Jefferson, China Jenkins, Demeita Johnson, Michelle Johnson, Reginald Johnson, Andrea Jones, Stephanie Jones, Beverly Joseph, Pandora Jubilee, Betty Keller, Ellamees Kelly-Molo, Terry Kidd, Elfreda King, Latina King, Edna Kingsley, Donny Leveston, Conrad Levy, Marlene London, Damita McClain, Marcus McNeil, Lue Mims, Ricardo Modeste, Kishma Moranice, Miesha Mosley, Ameenah Muhammad, Mary Page, Shirley Parish, Cynthia Patton, Wilma Perkins, Beverly Perry, Gertrude Perry-Ridley, Sheila Quinn, Ernest Reynolds, Kisten Rhodes, Erica Rhone, Carrie Robinson, Katherine Robison, Rose Russell, Victor Seaborn, Yolanda Simmons-Moore, Sonya Sneed, Jonathan Taylor, Shiarnice Taylor, Crystal Thomas, Brenda Tillis-Allen, Godwin Unuigbokhai, LaQuinta Vargas, Germaine Washington, Frederica Watson, Alyssa Wallace, Donna Williams, and Tina Young, individually and on behalf of other similarly-situated individuals,** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO._____ |
| *v.* | § § | **JURY DEMANDED** |

HOUSTON COMMUNITY COLLEGE §
SYSTEM §
                   *Defendant.* §

## PLAINTIFFS' ORIGINAL COMPLAINT,
## REQUEST FOR JURY TRIAL AND REQUEST FOR CLASS CERTIFICATION

**TO THE HONORABLE DISTRICT COURT JUDGE AND JURY:**

This suit is brought by Black Plaintiffs, Jeffery Austin, Joan Austin, Johnella Bradford, Antrece Baggett, Ashley Britton-Picott, Adrian Brown, Cassandra Brown, Deliah Brown, Trina Campbell, Felicia Rucker-Carter, Hyginus Chukwu, Shirley Collins, Lisa Cooper, Ava Cosey, Marie Cromwell, Terrence Crosby, Marcus Curvey, Carolyn Davis, Karen Davis, Syble Davis, Linda Denkins, Brigette Dennis, Chameeta Denton, Antionette Dickson, Charles Drayden, Rosemary Edwards, Catina Eiland, Lorlie Ellis, Readri Epps, Micalyn Flagg, Rosalyn Francis, Geraldine Gibson, Brandy Griffin, Afrah Hassan, Avis Horde, Kim Ingram, Dawnica Jackson, Rodney Jackson, Troy Jefferson, China Jenkins, Demeita Johnson, Michelle Johnson, Reginald Johnson, Andrea Jones, Stephanie Jones, Beverly Joseph, Pandora Jubilee, Betty Keller, Ellamees Kelly-Molo, Terry Kidd, Elfreda King, Latina King, Edna Kingsley, Donny Leveston, Conrad Levy, Marlene London, Damita McClain, Marcus McNeil, Lue Mims, Ricardo Modeste, Kishma Moranice, Miesha Mosley, Ameenah Muhammad, Mary Page, Shirley Parish, Cynthia Patton, Wilma Perkins, Beverly Perry, Gertrude Perry-Ridley, Sheila Quinn, Ernest Reynolds, Kisten Rhodes, Erica Rhone, Carrie Robinson, Katherine Robison, Rose Russell, Victor Seaborn, Yolanda Simmons-Moore, Sonya Sneed, Jonathan Taylor, Shiarnice Taylor, Crystal Thomas, Brenda Tillis-Allen, Godwin Unuigbokhai, LaQuinta Vargas, Germaine Washington, Frederica Watson, Alyssa Wallace, Donna Williams, and Tina Young, individually and on behalf of other similarly-situated Non-Hispanic Black individuals who applied for employment, worked at, and/or are working at Houston Community College after May 2016(hereinafter identified to as either "Plaintiffs" or "Putative Class Members"), complaining about Defendant Houston Community College (hereinafter identified to as either "HCC" or "College") for the following reasons:

## I.
## INTRODUCTION

1.     When Cesar Maldonado was approved as the new Chancellor of HCC in 2014, he

came armed with a racially discriminatory agenda.  Using his position as chancellor, Maldonado

adopted a "transformation" plan for the College which disproportionately impacted  Black

employees and Black employment candidates from advancement and/or hire at HCC.  To

implement his plan, Maldonado enlisted the help and cooperation of other lower level employees

such as Tom Anderson and Janet May—two people who held key positions over HCC's talent and human resources departments.

2.     Plaintiffs are but a few of the Black employees and applicants who became victims of Maldonado's racially-motivated scheme. They were all targeted, mistreated, demoted, suspended, improperly investigated, falsely accused, not hired, and/or asked to admit to objectively false accusations manufactured against them, and when they objected or refused to be complicit in their own improper punishment, they were either improperly disciplined, written-up, not hired or promoted, and/or removed from the workplace—all because of their race.

3.     This suit arises out of the deliberate acts of racial discrimination by Maldonado and his staff, undertaken in their decision-making and policy-making positions, on behalf of HCC. The complained-of practices and policies of the College treated non-Hispanic Black employees like Plaintiffs differently from Hispanic and White employees. The claims in this suit include damages resulting from retaliatory actions taken against Plaintiffs because of their race and/or for their participation in this lawsuit. Maldonado and his cooperating staff members, like May and Anderson, collectively acted in concert with one another under color of law to cause the harm and damages alleged in this suit. The conduct and policies of HCC violated Plaintiffs' rights protected in 42 U.S.C. § 1981 and enforceable under §1983 against HCC. Because HCC's discriminatory conduct is pervasive, systemic, widespread, and continuing against the Plaintiffs to this date, a request for class certification is included on behalf of all Black former and present College employees and applicants who after May 2016 applied for, worked and/or are presently working at HCC and were victims of Defendant's pervasive discriminatory scheme. Plaintiffs also individually complain about retaliatory and discriminatory actions taken against them at and by Defendant because of their race—i.e., Black.

## II.
## PARTIES

Following are the named Parties in this suit:

**A. Plaintiffs**

4.      Plaintiff Jeffery Austin is a resident of Houston, Harris County, Texas.

5.      Plaintiff Joan Austin is a resident of Houston, Harris County, Texas.

6.      Plaintiff Antrece Baggett is a resident of Pearland, Brazoria County, Texas.

7.      Plaintiff Johnella Bradford is a resident of Houston, Harris County, Texas.

8.      Plaintiff Ashley Britton-Picott is a resident of Houston, Harris County, Texas.

9.      Plaintif Adrian Brown is a resident of Houston, Harris County, Texas.

10.      Plaintiff Cassandra Brown is a resident of Houston, Harris County, Texas.

11.      Plaintiff Deliah Brown is a resident of Houston, Harris County, Texas.

12.      Plaintiff Trina Campbell is a resident of Houston, Harris County, , Texas.

13.      Plaintiff Felicia Rucker-Carter is a resident of Fresno, Fort Bend County, Texas.

14.      Plaintiff Hyginus Chukwu is a resident of Houston, Harris County, , Texas.

15.      Plaintiff Shirley Collins is a resident of Houston, Harris County, , Texas.

16.      Plaintiff Lisa Cooper is a resident of Channelview, Harris County, Texas.

17.      Plaintiff Ava Cosey is a resident of Houston, Harris County, , Texas.

18.      Plaintiff Marie Cromwell is a resident of Spring, Harris County, Texas.

19.      Plaintiff Terrence Crosby is a resident of Houston, Harris County, , Texas.

20.      Plaintiff Marcus Curvey is a resident of Houston, Harris County, , Texas.

21.      Plaintiff Carolyn Davis is a resident of Richmond, Fort Bend County, Texas.

22.      Plaintiff Karen Davis is a resident of Fresno, Fort Bend County, Texas.

23.      Plaintiff Syble Davis is a resident of Houston, Harris County, , Texas.

24.     Plaintiff Linda Denkins is a resident of Houston, Harris County, , Texas.

25.     Plaintiff Brigette Dennis is a resident of Houston, Harris County, , Texas.

26.     Plaintiff Chameeta Denton at the time of the events complained of in this case was a resident of Harris County, Texas.

27.     Plaintiff Antionette Dickson is a resident of Houston, Harris County, , Texas.

28.     Plaintiff Charles Drayden is a resident of Houston, Harris County, , Texas.

29.     Plaintiff Rosemary Edwards is a resident of Sugar Land, Fort Bend County, Texas.

30.     Plaintiff Catina Eiland is a resident of Spring, Harris County, Texas.

31.     Plaintiff Lorlie Ellis is a resident of Leander, Williamson County, Texas.

32.     Plaintiff Readri Epps is a resident of Richmond, Fort Bend County, Texas.

33.     Plaintiff Micalyn Flagg is a resident of Fresno, Fort Bend County, Texas.

34.     Plaintiff Rosalyn Francis is a resident of Missouri City, Fort Bend County, Texas.

35.     Plaintiff Geraldine Gibson is a resident of Houston, Harris County, , Texas.

36.     Plaintiff Brandy Griffin is a resident of Houston, Harris County, , Texas.

37.     Plaintiff Afrah Hassan is a resident of Houston, Harris County, , Texas.

38.     Plaintiff Avis Horde is a resident of Houston, Harris County, , Texas.

39.     Plaintiff Kim Ingram is a resident of Humble, Harris County, Texas.

40.     Plaintiff Dawnica Jackson is a resident of Humble, Harris County, Texas.

41.     Plaintiff Rodney Jackson is a resident of Houston, Harris County, , Texas.

42.     Plaintiff Troy Jefferson is a resident of Houston, Harris County, , Texas.

43.     Plaintiff China Jenkins is a resident of Humble, Harris County, Texas.

44.     Plaintiff Demeita Johnson is a resident of Houston, Harris County,  Texas.

45.     Plaintiff Michelle Johnson Is a resident of spring Harris County Texas.

46.     Plaintiff Reginald Johnson is a resident of spring Harris County Texas.

47.     Plaintiff Andrea Jones Is a resident of humble Harris County Texas.

48.     Plaintiff Stephanie Jones is a resident of Pearland Brazoria County Texas.

49.     Plaintiff Beverly Joseph is a resident of Houston, Harris County,  Texas.

50.     Plaintiff Pandora Jubilee Is a resident of Houston, Harris County,  Texas.

51.     Plaintiff Betty Keller is a resident of Houston, Harris County, , Texas.

52.     Plaintiff Ellamees Kelly-Molo is a resident of Houston, Harris County, , Texas.

53.     Plaintiff Terry Kidd is a resident of Houston, Harris County, , Texas.

54.     Plaintiff Elfreda King is a resident of Rosharon, Brazoria County, Texas.

55.     Plaintiff Latina King is a resident of Spring, Montgomery County, Texas.

56.     Plaintiff Edna Kingsley is a resident of Houston, Harris County, , Texas.

57.     Plaintiff Donny Leveston is a resident of Houston, Harris County, , Texas.

58.     Plaintiff Conrad Levy is a resident of New Caney, Montgomery County, Texas.

59.     Plaintiff Marlene London is a resident of Houston, Harris County, Texas.

60.     Plaintiff Damita McClain is a resident of Houston, Harris County, , Texas.

61.     Plaintiff Marcus McNeil is a resident of Houston, Harris County, , Texas.

62.     Plaintiff Lue Mims is a resident of Houston, Harris County, , Texas.

63.     Plaintiff Ricardo Modeste is a resident of Houston, Harris County, , Texas.

64.     Plaintiff Kishma Moranice is a resident of Katy, Harris County, Texas.

65.     Plaintiff Miesha Mosley is a resident of Humble, Harris County, Texas.

66.     Plaintiff Ameenah Muhammad is a resident of Stafford, Fort Bend County, Texas.

67.     Plaintiff Mary Page is a resident of Houston, Harris County, , Texas.

68.     Plaintiff Shirley Parish is a resident of Missouri City, Fort Bend County, Texas.

69.     Plaintiff Cynthia Patton is a resident of Missouri City, Fort Bend County, Texas.

70.     Plaintiff Wilma Perkins is a resident of Houston, Harris County, , Texas.

71.     Plaintiff Beverly Perry was a resident of Houston, Harris County, , Texas.

72.     Plaintiff Gertrude Perry-Ridley is a resident of Stafford, Fort Bend County, Texas.

73.     Plaintiff Sheila Quinn is a resident of Crosby, Harris County, Texas.

74.     Plaintiff Ernest Reynolds is a resident of Houston, Harris County, , Texas.

75.     Plaintiff Kisten Rhodes is a resident of Houston, Harris County, , Texas.

76.     Plaintiff Erica Rhone is a resident of Houston, Harris County, , Texas.

77.     Plaintiff Carrie Robinson is a resident of Houston, Harris County, , Texas.

78.     Plaintiff Katherine Robison is a resident of Houston, Harris County, , Texas.

79.     Plaintiff Rose Russell is a resident of Houston, Harris County, , Texas.

80.     Plaintiff Victor Seaborn is a resident of Cypress, Harris County, Texas.

81.     Plaintiff Yolanda Simmons-Moore is a resident of Houston, Harris County, , Texas.

82.     Plaintiff Sonya Sneed is a resident of Rosharon, Brazoria County, Texas.

83.     Plaintiff Jonathan Taylor is a resident of Fresno, Fort Bend County, Texas.

84.     Plaintiff Shiarnice Taylor is a resident of Houston, Harris County, , Texas.

85.     Plaintiff Crystal Thomas is a resident of Houston, Harris County, , Texas.

86.     Plaintiff Brenda Tillis-Allen is a resident of Missouri City, Fort Bend County, Texas.

87.     Plaintiff Godwin Unuigbokhai is a resident of Katy, Harris County, Texas.

88.     Plaintiff LaQuinta Vargas is a resident of Houston, Harris County, , Texas.

89.     Plaintiff Alyssa Wallace is a resident of Freno, Fort Bend County, Texas.

90.     Plaintiff Germaine Washington is a resident of Houston, Harris County, , Texas.

91.     Plaintiff Frederica Watson is a resident of Houston, Harris County, , Texas.

92.     Plaintiff Donna Williams is a resident of Pearland, Brazoria County, Texas.

93.     Plaintiff Tina Young is a resident of Richmond, Fort Bend County, Texas.

94.     All similarly situated Plaintiffs (hereinafter identified as either "Class Members" or "Putative Plaintiff Class") are all Non-Hispanic Black individuals who applied for employment, worked at, and/or are working at Houston Community College after May 2016.

**B. Defendant**

95.     Defendant Houston Community College ("the College") is a public institution situated in Harris County, Texas and may be served with process by serving its registered agent, Karen L. Schmidt, located at 3100 Main, Suite 12B12 (MC 1148), Houston, TX 77002.

**III.**
**JURISDICTION, VENUE, AND WAIVER OF IMMUNITY**

96.     This Court has federal-question jurisdiction over the alleged violations of federal-anti-discrimination laws, including but not limited to 42 U.S.C. § 1981 which is enforceable in this action under 42 U.S.C. §§ 1983, and pursuant to 28 U.S.C. § 1331.  Moreover, federal jurisdiction is appropriate over Plaintiffs' class allegations pursuant to the Class Action Fairness Act.  *See* 28 U.S.C. § 1332(d).

97.     The conduct complained of in this suit concerns a generalized policy, custom and practice of conscious and deliberate racial discrimination, retaliation, harassment, and disparate treatment of non-Hispanic Blacks at HCC in violation of 42 U.S.C. §§ 1981 and 1983, which provides a cause of action and waiver of HCC's alleged immunity. The complained-of conduct was deliberate, willful, intentional, and clearly unlawful at the time of its occurrence. The referenced federal law provides for a private cause of action and waives the College's immunity

and permits Plaintiffs to press their private claims in this suit against HCC.  Because the College

accepts federal grant funding,[1] the the College thereby expressly agreed to waive its sovereign

immunity to the type of racial discrimination and retaliation claims Plaintiffs assert in this case.

See Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll., 959 F.3d 178

(5th Cir. 2020) (governmental entity which accepts federal funds held to have expressly waived

sovereign immunity as to discrimination claims).

98.     Venue is proper in the Southern District of Texas because the events complained

about in this case substantially occurred in Harris County, Texas, and within the Houston Division.

Additionally, the Defendant has its principal place of business in this District.  At least one or more

of the Plaintiffs have satisfied all conditions precedent, either individually and/or representatively

on behalf of the Putative Plaintiff Class, to bring the claims asserted in this suit, including

exhaustion of pre-trial administrative opportunities to resolve this dispute, if any such acts were

required.

### IV.
### BACKGROUND

99.     Plaintiffs are victims of a well-developed, systematic, entrenched, and wildly

successful campaign of deliberate race and sex discrimination against non-Hispanic Black

employees in various employee and leadership positions at HCC.  This "campaign," led by

Maldonado and implemented and enforced by a number of unsued supervisors at the College, is

and was carried out with great efficiency and has resulted in the dismissal, demotion, displacement,

and/or termination of Black employees at alarming and disproportionate rates.  Maldonado and his

henchmen target Black executives and employees to be removed or demoted, then subordinates

---

[1] See Exhibit 1: Relevant pages from the HCC's 2019 Fund Report documenting its receipt and acceptance of
federal funding at the College.  Such receipt of federal funds continued throughout the entirety of the period covered
by this suit.

manufacture false claims against the Black employees which then are purportedly "investigated"—which investigations manufacture objectively false claims against the Black employees—resulting in their ultimate dismissal, termination or being victims of other adverse employment action.  College subordinates like Thomas Anderson, Janet May, and Maya Durnovo, have participated in and/or have authorized false reports or charges against many of the Plaintiffs named in this suit, and approved these false reports even when the alleged wrongdoing was probably false.  Janet May and others under her then carry out the displacement of the Black employees by either placing them on "leave of absence," "transforming" the employee out of their job, or the employee's position is "transformed" to a different title or eliminated all together, then the "vacancies" or "new positions" are filled by less qualified Hispanic or White candidates. Also, the slightest perceived rule infraction by a Black employee is exaggerated and elevated to a serious offense worthy of severe disciplinary action, "final write-ups," or termination; while similar and even more grievous infractions by Hispanic and White employees are ignored, treated as trivial, and/or are overlooked entirely.  HCC has essentially put in place an effective "Displacement Plan" for Black employees which is pretextual to get around the appearance of racial discrimination when in fact it is utilized to discriminate against Black employees.  Following are some of the more common components of the various discriminatory schemes used at HCC to rid itself of talented Black employees:

  a.  a Black employee is targeted for firing, disciplinary action, demotion, or removal;

  b.  allegations are manufactured with *false, exaggerated, excessive, or completely untrue* narratives about the Black employee which purports to claim the Black employee violated some HCC rule or policy;

  c.  an "investigation" is launched into the inflated or false charge;

  d.  the charade of an "investigation" is merely a pretext to place the Black employee under suspicion, placed on administrative leave, reassigned, or have their position

eliminated all together;[2]

e.  the Black employee is then confronted with the trumped-up charges and result-oriented investigation and the findings in the "investigation" are then used to "pad" the employee's personnel file for justification of further adverse employment actions against the Black employee; and

f.  if the Black employee refuses to confess to the false and/or exaggerated charge(s), or otherwise tries to expose the injustice of the charge (for example, by filing an EEOC complaint, filing or participating in litigation against the College, or whistleblowing), they suffer multiple indignities such as being placed on forced administrative leave, deprived of promotions, placed under the supervision of unqualified employees whom the Black employees actually first trained, and/or being left out of meetings and ultimately terminated from their employment.

100.   HCC's Displacement Plan for Blacks has been so flagrantly used it has resulted in the displacement of 90% of the Black top level executives/professionals who were at HCC when Maldonado came on as chancellor. Compared to the number of veteran Black employees who have been "transformed" or terminated out of their positions since Maldonado arrived, only 10% of comparably-positioned White professionals have been displaced.  Additionally, there has been a 50% increase in Hispanic hires and promotions to top level positions since Maldonado's arrival—many of which Hispanic hires and promotions were made to less qualified and less-experienced candidates.

101.   White and Hispanic employees are not systematically displaced like Black HCC employees.  Indeed, their transgressions are routinely ignored and go unpunished while Black employees accused of lesser or the same transgressions are disciplined more harshly, sent home, placed on leave of absence, placed under "investigation," and variously demeaned in the workplace.

102.   In less than six years at the helm of HCC, Maldonado's racist regime has succeeded

---

[2] Plaintiffs have evidence of HCC top-level officials requiring neutral or no-violation investigative findings against a Black employee being ordered to be changed to more negative findings even when facts do not support such findings.

in firing and/or removing all but a few top-level Black employees from their positions. Many of the fired and removed Black employees have held their positions for decades while compiling exemplary work histories at the College before Maldonado's arrival.

## A. Maldonado s Documented  Hispanic Preference" Agenda

103.    The massive displacement of senior level Blacks at HCC is not accidental. Nor is the displacement of Blacks merely *de facto* discrimination (although it certainly is that)—it is much more premeditated and intentional as documented in an email string Plaintiffs have obtained.[3]

104.    Maldonado became chancellor in May 2014. He is Hispanic. He immediately set the College on a dramatic new racist course. Within a month of being confirmed as the new chancellor, Dr. Ricardo Solis, a Hispanic Director at HCC, explained in writing that Maldonado would adopt policies and take actions to provide *preferential treatment for Hispanics*. In an April 21-24, 2014 email string, Solis wrote to Maldonado congratulating him on his appointment. Solis offered to provide the new chancellor with "the pulse of [the College] system" and invited him to have dinner soon. Within days of that email, Solis wrote another Hispanic colleague at HCC the following prescient email reflecting Maldonado's racist agenda: "Now WE [Hispanics] will finally get *preferential treatment*."[4] Another recipient on the email string will testify in this case that he personally saw and participated in HCC interviews where more qualified Black employees were repeatedly not even considered while less qualified Hispanic candidates were put into positions

---

[3] An authorized recipient of the email string supplied the emails to Plaintiffs.

[4] *See* Exhibit 2. One of the recipients of these emails will testify that he personally observed intentional discriminatory decisions being made to hire multiple less-qualified White and Hispanic applicants over more qualified Black candidates. There is also evidence that new HCC positions were promised to Hispanic or White hires before Black employees were ever notified that the positions were being posted or available for the Black employees to apply. Another scheme was to "eliminate" a position held by a Black employee, only to recast the same or similar job duties under a different title, then give the "new position" to a Hispanic or White candidate.

they were not qualified to occupy. The Solis email string would soon prove true "*preferential treatment*" of Hispanics was going to be Maldonado's racist agenda.   Such a race-based policy is *per se* racist.

105.     Solis's emails could be dismissed as the wishful thinking of Maldonado's personal friend except that, as Solis was an HCC director at the time, his emails indicate the extent and forethought dedicated to the general policy that led to HCC's Displacement Plan, as well as his confidence in Maldonado's preferential program for Hispanics.  Moreover, Solis's prediction has proven to be factually true.  While Black employees in leadership and other roles have been uniformly reduced, less-trained and less-experienced Hispanics and Whites have flooded in to replace them.  The events since Maldonado's arrival only make sense when understood in the context of HCC's scheme of racial discrimination and retaliation against Black employees.

**B.  HCC s Racial  Displacement Plan" to Discriminate Against Black Employees**

106.     HCC's board of trustees, in practice, has delegated their power and authority to Maldonado, who in turn has admittedly assigned, delegated to, and acted in concert with his subordinates the right and authority to hire, investigate, discipline, and terminate the Black employees.[5]  Accordingly, Maldonado and the unsued defendants, Anderson and May, are and were the final decision-makers in many instances with respect to the employment policies and practices challenged in this suit.

107.     The common practices utilized by these executives yield one of three common

---

[5] In another racial discrimination lawsuit filed by a former Black HCC executive, Maldonado confirmed under oath that he simply relies on and accepts the recommendations of his underlings like Janet May and Thomas Anderson in terminating, disciplining,  and/or demoting employees.  *See* Maldonado's sworn deposition testimony in Cause No. 2015-77438, *Dr. Sabrina Lewis v. Houston Community College*, taken in the 269th District Court, Harris County, TX. While this testimony is not entirely true—because Maldonado himself instigated the directive by action and policy that Black executives are expendable—it is true that his directive is implemented with dispatch by May and Anderson to rid the College of experienced Black employees.

outcomes:  (1)  Black employees relent to the false charges to keep their jobs, which action is then used to include a demerit in the employee's file justifying a demotion or is used as ammunition for additional adverse employment actions against the employee in the future; (2) the investigations, administrative leave, and harassment continues until the Black employee has no choice but to leave or resign their position; and/or (3) if the Black employees resist the incredible pressure placed of them, they are terminated, disciplined,  put on forced leave, or demoted.

108.    As part of this common discriminatory practice, Anderson and May have generally signed off on the alleged "investigations" of Black employees and, finally, "approved" the investigations even when they are knowingly false and/or objectively exaggerated.  Indeed, Anderson and May have routinely and customarily signed off on and implemented harsher punishments for Black employees than White and Hispanic employees accused of the same or more egregious policy transgressions, and Maldonado ratifies their decisions.

109.    Placing an employee on forced "leave of absence" is HCC's way of placing the employee under a cloud of suspicion suggesting they have engaged in a major act of wrongdoing. Since Maldonado's arrival, nearly 95% of the time when a Black person is given a forced "leave of absence" they have been ultimately terminated or demoted.

110.    Even more distressing is the fact that unsued executives Thomas Anderson and Janet May have changed and/or added *undated* policy changes in employee manuals which can later be used as a basis to dismiss or punish Black employees.  This practice has actually been witnessed by a Plaintiff named in this suit.  Such undated policy changes would make it difficult or impossible for employees to know what and when such changes became enforceable or were approved.  Such a practice is contrary to accepted and approved College Human Resources practices.

111.    By April 13, 2015, Maldonado had implemented what he termed a "transformation" plan, which in effect was his way of displacing Blacks and hiring more less qualified Hispanic and White employees.   HCC's publications pretend that its displacement of Blacks is merely undertaken as part of "transforming" the College to a better educational center.   And, in a literal sense, they are in fact "transforming" the College—its upper tier supervisors and personnel are becoming whiter and more Hispanic at the unfair and discriminatory expense of Black employees. When Black executives are removed, their vacancies are disproportionately filled with less qualified Hispanic and White employees.

112.    Plaintiffs have evidence that the term "transformation" was a clever afterthought to mask the true intent of the plan—i.e., to get rid of more Black employees.   Plaintiffs' counsel has located a witness who will testify that Maldonado and HCC eschewed the phrase "reduction in force" ("RIF") because such an approach to displace employees would be expected to proceed on a "last in-first out" basis or "point-score-calculation" method which would easily compare employees based on tenure and merit.   Such neutral systems would not easily accommodate the goal of racial replacement of seasoned Black executives at the College.   Instead, Maldonado decided on a "transformation" scheme which more easily accommodated his goal of displacing Black employees in favor of hiring more Whites and Hispanics.

113.    Proof of the success of the College's Displacement Plan in ridding itself of experienced Black employees is readily discoverable.   Following are but a few actual instances of how the discrimination plot has disparately impacted experienced Black employees at the College since Maldonado's arrival:

      a. 45+ year employed top-level Black female, with decades of exemplary work at the College, passed over for a promotion for which she was the most qualified candidate and the position given to a less qualified 30-year-old Hispanic female.

b. 20+ year employed Black female, with prior exemplary work history, targeted for removal by the Administration and forced out of her position when her duties were "transformed" and given to a non-Black employee.

c. 25+ year employed Black female demoted, and ultimately forced out of her position without cause, when her job functions were "transformed" to non-Black employees.

d. 20+ year employed Black female working in a supervisory position, with exemplary prior work history, assaulted by a white female employee in the workplace, then targeted for removal by the Administration. The white female who was the wrongdoer was allowed to remain employed—the innocent Black female supervisor who did not assault the white employee was fired.

e. 20+ year employed Black female targeted for removal by the Administration and forced out based on a manufactured false claim.

f. 22+ year employed Black female, with prior exemplary work history, targeted for removal by the Administration and forced out of her position under the College "transformation" plan.

g. 41+ year employed Black female passed over for promotion to an Executive Director position for which she was the best and most qualified. A white male was given the position.

h. Black female with 7 years' experience working at the College targeted for removal by the Administration and forced out after observing unethical purchasing practices by her Hispanic Purchasing Department Director without any corrective action being taken by the Administration against the Hispanic employee. Only the Black female who complained was displaced.

i. 42+ year employed Black female at the College, and creator of the most successful online enrollment program at the College, targeted for removal by the Administration and was removed from her presidency at the NW College's North West campus and replaced by a non-Black hire.

j. 38+ year employed Black female at the College targeted for removal by the Administration and forced out and replaced by a non-Black employee.

k. Black female with 8 years of employment at the College targeted for removal by the Administration and forced out and replaced by a non-Black hire.

l. 20+ year employed Black female at the College targeted for removal by the Administration and demoted to a low-level position related to "transformation."

m. 23+ year employed Black female at the College targeted for removal by the Administration and fired for reporting a terroristic threat by a white female co-

worker in the workplace.  The report was made to the College's police department consistent with policy.  The Black female was fired for reporting the white female's threats to the College's police department while the white female was allowed to remain employed.

n.  25+ year employed Black female at the College filed a sexual harassment claim with the College against her white supervisor. She was "investigated" and made to remain under the management and supervision of the white male offender. No known corrective or disciplinary action has been undertaken against the white supervisor.

o.  11+ year employed Black male properly corrected a white female vendor who was being disrespectful to subordinates in his department.  The white female lodged a false claim of sexual harassment against the Black male.  The Administration's investigator told the Black male that he found the white female's word more credible even though there were multiple witnesses corroborating the Black male's side of the story and no credible corroborating witnesses for the white female's story.

p.  a Black female, after 4+ years of superlative work at the College, was targeted for removal by the Administration and removed from campus, placed on mandatory leave of absence, demanded to admit to a false claim that she created a hostile work environment if she wanted to keep her job—a demand she rejected, retaliated against for reporting the College's misuse and suspected theft of federal grant dollars, and ultimately replaced by a woefully unqualified Hispanic male.[6]

114.    In isolation, or in any particular case, the discriminatory program behind HCC's Displacement Plan/"Transformation" program might be difficult to decipher.  However, when viewed over years of implementation, the commonality and "success" of the discriminatory scheme against Blacks comes into clear view.  There are both objective and subjective data proving the College's disparate and discriminatory treatment of Black employees since Maldonado's arrival.

### C.  Individual Plaintiff Allegations of Black Plaintiffs

115.    Jeffery Austin- Race  Discrimination:  Pay  Disparity/Promotion/Advancement

---

[6] The Hispanic male who replaced  the experienced Black female had zero experience or training in grant compliance even though the College's job description for the position required multiple years of actual experience in grant management and grant compliance.  Brown was qualified for the position—the Hispanic male was clearly not.  *See* Exhibit 3.

Denied – "Transformation" forced Mr. Austin from his Procurement Supervisor position to Procurement Liaison. HCC denied him raises and promotions to Campus Manager II for which he was qualified. Though he had worked as a Campus Manager II from 2006 -2009, Sandra Roman, a less qualified Hispanic female who was previously Secretary II employees with no Campus Management experience, was hired and put into the position.

116.    Joan Austin - Race discrimination – Ms. Joan Austin was an HCC employee for 31 years. She was constructively discharged when she was forced to retire under duress due to discriminatory and insulting language used against her by her Hispanic manager, Indra Palaez. Ms. Palaez would remove herself and other Spanish-speaking staff members to a separate room to conduct HCC business in "Spanish-only sessions" and exclude Ms. Austin. Ms. Palaez also breached Ms. Austin's privacy rights by sharing private medical information with other Hispanic employees about Ms. Austin.  Such behavior was not only discriminatory, it violated Austin's HIPAA rights.  After Ms. Austin was forced out,  a young, Hispanic female replaced her.

117.    Antrece Baggett - Race discrimination: Pay Disparity/Promotion/Advancement Denied/Demotion/Income Reduction - Antrece Baggett was a division chair at HCC Southeast College from 2013-2015. In 2015, HCC "transformed" and/or eliminated the college division chair position. After which, Ms. Baggett applied for both History Department Chair and History Associate Chair, two positions she was qualified to hold. A white male was chosen as the chair and Ms. Baggett and another white male were offered the History Associate Chair positions. On September 4, 2020, Norma Perez, a Hispanic female, "transformed or dissolved" another directorship that Ms. Baggett had held since 2008 and "transformed" Africana African American and Women and Gender Studies Certificate Programs (a program Ms. Baggett helped create) to another department. Norma Perez also reduced Ms. Baggett's release times, thus reducing her pay

for the numerous departmental duties she was performing at HCC.

118.    Johnella    Bradford    -    Race    Discrimination:    Demotion/Income
Reduction/Promotion/Advancement Denied – Dr. Bradford has been an HCC employee for 43.5 years. Dr. Bradford's position was "transformed" and transferred to a part-time Hispanic Outreach Coordinator. In 2017, at Dr. Maldonado's direction, HCC "transformed" or dissolved Dr. Bradford's position as Director and assigned her to a temporary full-time Faculty position at 50% of her salary which was less than other similarly-situated employees. In 2018, HCC required Dr. Bradford to reapply or lose her job. HCC did not consider Dr. Bradford for any of the management openings for which she repeatedly applied and for which she was qualified.

119.    Ashley Britton-Picott - Race Discrimination/Hostile Environment/Retaliation: In 2018, Kathy Engle (Ms. Britton-Picot's manager) said HCC was hiring too many  Black people. Ms. Britton-Picott filed an internal complaint against Ms. Engle for racial discrimination and for hostile work environment. Even though an investigation determined that Ms. Engle had made the statement that "HCC was hiring too many Black people," HCC took no action on the complaint. Subsequent to the complaint being filed, Ms. Engle retaliated against Ms. Britton-Picott and gave her a false/negative PEP review. Ms. Britton-Picott applied for other positions within the college and thought she had a good chance of moving to another department. However, after following up on numerous promising job openings and receiving no positive response, she was advised that she should just stop trying to get another position in the College. Ms. Britton-Picott was constructively discharged from HCC when she was forced to resign due to undue stress, retaliation, and a hostile work environment.

120.    Adrian Brown - Race Discrimination: Denied promotions/advancements – Mr. Brown served as an adjunct faculty member for more than a decade.  During that period, he applied

for many full-time positions at HCC.  Many of the jobs he applied for were awarded to White or Hispanic candidates despite Mr. Brown's excellent work history at the College as a part-time instructor.  He was forced to resign after not receiving any full-time job offers as he was no longer able to support himself financially on his part-time salary.   Mr. Brown was qualified to be hired in most, if not all, of the position for which he had applied.

121.    Cassandra Brown - Race Discrimination: Denied promotions/advancement/Denied equal work provisions and opportunity/Retaliation – Ms. Brown is a 12-year employee at HCC. She has applied for at least 14 positions within HCC for which she has been qualified. She applied for the position of Recruiter in 2019, and HCC hired a less qualified Hispanic male. At the beginning of the COVID pandemic, Managers JoEllen Soucier and Boni Jacobs denied her the required hardware to perform her work from home. Ms. Brown filed an internal complaint. As a result, Soucier and Jacobs retaliated against her and denied promotions and advancement.  White and Hispanic employees were supplied needed hardware to perform their work from home.

122.    Delilah Brown -  Race  Discrimination:  Denied  promotion/advancement/Pay disparity - Deliah Brown has been employed with HCC for one and a half decades. She has repeatedly applied for numerous full-time positions. Between 2014 and 2020, Ms. Brown applied for more than 50 HCC openings. Despite being a veteran and having a master's degree in History and Sociology, HCC has not offered her a full-time job.  She is more than qualified for positions she applied for.

123.    Trina Campbell - Race  Discrimination:  Denied  promotion/advancement/Pay disparity – Trina Campbell is an 11-year employee at HCC. In 2018, Ms. Campbell's manager, David Diehl, requested a job analysis for Ms. Campbell to receive a pay increase based on her work as Office Manager. Norma Perez, a Hispanic female,  without any review or investigation of

the matter, denied the request. HCC has presented no way for its employees to understand how the pay scale works. In 2020, Ms. Campbell applied for a position as a Senior Representative, Talent Technology. Janet May offered Ms. Campbell the job but only if she took $5,000 less than her current salary and said that it was not negotiable even though Ms. Campbell was aware that other non-Black employees had taken on new roles and were able to keep their current salary.

124.    Hyginus Chukwu - Race Discrimination: Adverse policy action/Retaliation - Hyginus Chukwu was a 15-year employee at HCC. HCC terminated him with a vague and manufactured claim that he had violated some unspecified HCC policy. HCC failed to identify any particular policy that he supposedly violated.  He alleges he was terminated because of HCC's racist agenda against Black employees.

125.    Shirley Collins - Race Discrimination: Demotion/Income Loss/Reduction in Retirement Contribution - Shirley Collins is a 7-year employee of HCC whose position was "transformed" from Student Accounts Receivable Specialist to Accounting Specialist. Alexandria Garcia, her Hispanic manager, enforces HCC work policies toward her differently from how she enforces them against her Hispanic coworkers.  For example, she and another female are the only two Black employees in her department who have to clock in and keep up with their hours even though they are salaried employees.  Other non-Black salaried employees are not required to go through this demeaning process.  Ms. Collins has completed multiple applications for other HCC positions but has received no offers despite holding a master's degree and being qualified for the applied for positions.

126.    Lisa Cooper -  Race and Gender Discrimination: Pay disparity/Severe disciplinary actions/Unequal application of HCC policies to Black Employees/Hostile work environment - Ms. Cooper is a 22-year+ employee in HCC's Police Department. She filed grievances against HCC

Chief Greg Cunningham, Captain John Boxie, and Captain John Dziedzic for improper conduct. In turn, they all have retaliated against her by, among other things, disparaging her character and work ethic in public gatherings during roll call, charging her with manufactured/misleading violations, then penalizing her harshly, sending her on errands, and putting her on foot patrol – duties generally assigned to officers with less seniority. If officers file an internal complaint with HR, HR enlists Chief Cunningham's help; thus, if her complaint is against one of the Chief's "friends," and she has found no relief because of this system. HCC has hired new Hispanic and White police officers at annual salaries that are $2,000-5,000 more than Ms. Cooper's pay as a 22-year veteran. Though she has asked about this pay disparity, neither HCC's HR Department nor Chief Cunningham can or will explain the pay disparity.    They continue to pay the newly-hired White and Hispanic officers more.

127.    Ava Cosey - Race Discrimination: Demotion/Income Loss/Retaliation - Ava Cosey is a long-time HCC employee who has been denied equitable pay for the work she has performed over the years compared to a white female coworker, Karin Hutchins – who did not have to file a grievance to get escalated pay. Also, she filed a sexual assault claim against a friend of David Cross (Director EEO Compliance, Title IX Coordinator, Office of Institutional Equity and Diversity at HCC)  and has suffered retaliation ever since.

128.    T. Marie Cromwell - Race and age discrimination: Denied promotion/ advancement/Income Loss/Retirement Loss: Dr. Marie Cromwell was a long-time HCC employee since 1974. From November 2015 to March 2016, she served as the Interim Dean of Students. Dr. Irene Porcarello, a Hispanic female and the President of Southeast College, informed Dr. Cromwell that she would not be considered for the Dean  position and asked her to chair the selection committee for filling the position. Dr. Porcarello denied Dr. Cromwell the opportunity

to compete for the job that she was qualified to fill—having served in the position as interim. Instead, HCC/Dr. Porcarello hired a less qualified thirty-year-old Hispanic female, Indra Pelaez, who did not have the years of experience or qualifications of Dr. Cromwell possesses.  This young Hispanic female, Pelaez, became Dr. Cromwell's boss.

129.    Terrence Crosby - Race Discrimination: Denied promotion/advancement and equal pay - Terence Crosby is a 3-year HCC employee. He has applied for four different positions (Tech II (twice), Tech III, and Quality Assurance Coordinator). Manager Marshal Heins informed him he did not qualify for the promotions even though they are the very same jobs he is already doing as a Tech I but with higher pay. Mr. Crosby worked during the pandemic, but neither HR nor his managers will approve essential pay as they have approved for other employees.

130.    Marcus Curvey, Jr. - Race Discrimination: Pay disparity/Denied advancement/ Retaliation/Hostile work environment - Marcus Curvey is a 17-year+ employee of HCC's Police Department. In 2014, he, another officer, Christian Washington (Black male), and Brook Richardson (a White female officer) confronted their pay disparity with Human Resources. HR adjusted only the White female's pay and removed the pay scale from the public forum thereafter so the disparity could no longer be monitored. In 2015, Officer Curvey was promoted to supervisor and received a minimal pay increase. His salary is approximately $20,000 less than his Hispanic and White counterparts who have less seniority. At least nine Black police officers with about ten years seniority earn on average $10,000 less than their Hispanic and White coworkers of equal or lesser seniority. HCC Capt. John Boxie is accused of stating at roll call that HCC will terminate any officers engaged in or helping with the racial discrimination lawsuit filed against HCC by Zelia Brown.

131.    Carolyn Davis - Race and Age Discrimination/Denied promotions/ advancement/

Income Loss/Received manufactured/false PIP - Carolyn Davis currently works as the Manager for College-to-Careers at HCC. She applied for the Associate Dean of Student Success position three times. Although she served on the "transformation team" and wrote the Director of Career Services' job description, HCC hired James Mable, a man under 40 years of age with less experience in career services and management than she has. In late April 2016, HR Generalist Elizabeth Simien and the Dean of Student Services, Dr. James Shippy, gave Dr. Davis a PIP based on alleged misleading allegations. She denied the allegations, yet HR told her to sign the acknowledgment to include in her personnel records and move on. Dr. Davis applied for the Associate Dean position, yet HCC hired Marisol Garza, a Hispanic female, with less experience and credentials. HCC hired an outsider, Ana Maria Lopez (who interviewed remotely), and groomed her for upper management. Over the last 12 years, Dr. Davis has applied for more than 40 positions and received only two interviews and no promotions from any the interviews for positions for which she was clearly qualified to hold.

132.    Karen Davis - Race    discrimination:    Pay    disparity/Denied    promotions/ advancement/ False and unwarranted disciplinary actions - Karen Davis is an 18-year+ employee of HCC's Police Department. HCC's HR and Chief Cunningham refused to increase Officer Davis's pay to reflect that of her White and Hispanic coworkers. In 2014, after 12 years of service, Officer Davis received a base pay increase. However, a White officer with only half of her experience hired on at the time for nearly the same salary. Within the last few years, HCC has hired the following individuals and paid them more even though Officer Davis has more years of service than all of them: Cindy Castillo, Jennifer Montiel, David Matkiysk, and others. Though she has asked about the obvious pay disparity, neither HCC's HR Department nor Chief Cunningham will explain or justify the discriminatory pay disparity.

133.    Syble Davis - Race discrimination: Denied promotion/ advancement/ Retaliation/Received False/Manufactured PIP – Allen Ainsworth retaliated against her for filing a complaint and put her on a manufactured PIP. Being on PIP prevented her from advancing and receiving promotions. HCC demoted Ms. Davis and put a white female (Stacey Hidgen) in her place.

134.    Linda Denkins - Race discrimination: Denied promotion/ advancement/ Demotion/Income Loss/Retirement Loss - Linda Denkins was a 40-year+ employee of HCC. HCC moved counselors from the faculty pay scale to a lower pay scale which caused Ms. Denkins to lose thousands of dollars of income. Though Ms. Denkins applied for several other positions in the following years, HCC hired Hispanic individuals instead. She stopped applying for any positions because it was clear HCC would hire a Hispanic for the job.  HCC "transformed" Ms. Denkins' job and lowered her pay and status. Ms. Denkins was constructively discharged because she was humiliated and forced to resign to avoid losing retirement income with each demotion and pay reduction.

135.    Brigette Dennis - Race discrimination: Wrongful termination/Manufactured violation - Brigette Dennis was an 11-year employee of HCC. Supervisors Patrick Teoh and Amanda Guerrero terminated Ms. Dennis based on false and fabricated allegations. HR informed her that Mr. Teoh had a right to terminate her even though the reason for the termination was no longer based on the allegation.

136.    Chameeta Denton - Race discrimination: Received false/misleading policy violation/ Forced resignation - Chameeta Denton worked for HCC from 2016 – 2019. She received a manufactured write-up for violating FERPA. She filed a complaint against HR because of this false write-up. Norma Perez and Tara Bond told her that she had no choice but to sign the false

charge if she wanted to keep her job. On the other hand, Ms. Denton tried tirelessly to remove one of her subordinates (a Hispanic female) who chronically violated HCC policy. The Hispanic employee emailed Cesar Maldonado and he allowed her to remain employed despite numerous policy violations.

137.     Antionette Dickson - Race discrimination: Transformation/Hostile work environment/Pay disparity/Promotion-Advancement denied - Dr. Dickson worked at HCC for 11 years. She suffered constant harassment from her supervisor Sandra Bouvier, a Ehite female, in the Centers for Entrepreneurship Department. Ms. Bouvier was known to say, "just fire 'em'" when speaking about Ms. Dickson and four other Black female workers within the department. Ms. Bouvier often referred to Dr. Dickson and other Black employees as "you people" and would degradingly ask her to carry her purse. Dr. Dickson often felt uncomfortable with the way Ms. Bouvier and her Hispanic assistant, Evelyn Velasquez, spoke about Black people. Bouvier and Evelyn Vasquez worked to remove all Black females from the department. They would harass, then fire the Black employees. Dr. Dickson trained Danica McGee, a white female, from 2014 to 2015. After the training, Dr. Anzivino increased Ms. Gee's salary, which surpassed Dr. Dickson's salary. In 2018, HCC notified Dr. Dickson that her position was being "transformed." She applied twice for the full-time equivalent of her part-time job, but Dr. Anzivino said that HCC was going in a different direction and refused her the position. Dr. Dickson was transformed and terminated out of employment.

138.     Charles Drayden - Race discrimination: Mr. Drayden is a licensed attorney who worked for HCC for seven years as an adjunct professor. He applied for several full-time positions but was repeatedly denied promotions/advancements even when he was the most qualified.

139.     Rosemary Edwards - Race discrimination: Transformation casualty/ forced

resignation - Rosemary Edwards was a mathematics professor at HCC for 15 years. In 2018, due to "transformation," the department did not assign any classes to her but instead gave them to newly hired faculty members who were not Black. HCC constructively discharged Ms. Edwards when she was forced to resign from her position in late 2019.

140.   Catina Eiland - Race discrimination: Wrongful termination/ Denied FMLA /Retaliation/Forced to sign fabricated violation/complaint - Ms. Eiland worked as an enrollment associate at HCC from 2009-2018. She was displaced from her home as a result of Hurricane Harvey and was diagnosed with PTSD. Despite this condition, HCC refused to allow her to use FMLA and informed her that she would lose her job if she did not return to work. HCC gave Ms. Eiland's original job duties and direct reports to Laura Velasquez, a Hispanic female, who was in school at the time and had no degree. HCC terminated Ms. Eiland's employment only to rehire her in a reduced capacity.

141.   Lorlie Ellis - Race discrimination: Denied promotion/advancement - Ms. Ellis worked in several positions at HCC from 2008 – 2016. She faced constant harassment and retaliation from her supervisors, especially after Maldonado arrived. In her dedication to HCC, Ms. Ellis applied for several positions at HCC but was never even offered an interview. To improve her prospects, she obtained a doctorate and applied for additional jobs within HCC also to no avail. Without any path available at HCC to advance, she was forced to resign.

142.   Readri Epps-Lincoln – Race discrimination: Retaliation/ Harassment/ Intimidation/ Reduced Pay - Readri Epps-Lincoln was hired by Houston Community College in May 2000 as the Senior Human Resources Representative, and worked in the Human Resources department for sixteen (16) years under Katherine Engle (current Executive Director) and Janet May (Chief Officer of Talent Engagement), both of whom are white females. Ms. Epps-Lincoln accepted a

demotion to escape the continual harassment, intimidation, retaliation, and discrimination from Janet May and Katherine Engle. She has personal knowledge of the systemic and customary negative retaliatory tactics used by Janet May and top HCC leadership to discriminate against Black employees in order to remove them from HCC's employ. She knows HCC's tactics included changing employee policies and procedures to demote, terminate, reorganize, or eliminate Black employees without any performance justification. A customary way of making a Black employee susceptible to termination was to pad their personnel files with trumped-up infractions. Black employees were routinely given more disciplinary write-ups than White and Hispanic employees even when they allegedly violated the same policies. Blacks were not treated equally with White and Hispanic employees when it came to disciplinary punishment or terminations. A common practice at HCC was to leave the Black person out of meetings, criticize them for not knowing what was going on, then "transform" their positions. In 2015, the Human Resources department transformed into Talent Engagement, and Janet May took swift steps to eliminate Black employees in the department. During this time, Janet May also merged Employment Services with the Department of Employee Learning & Organizational Training. May merged the Records Department with Benefits, Compensation & HRIS Department. She had previously stated in a departmental meeting that she (May) would post the vacant positions for all to apply. However, once several qualified Black employees indicated they would apply for the position, Janet May appointed Katherine Engle and Hina Naik to the vacant positions with Chancellor Cesar Maldonado's approval. Ms. Epps-Lincoln, Marlene London, Cathy Douse Harris, and Shirley Parish (all  Black employees) had worked for the College much longer and had more experience and relevant knowledge than Ms. Engle and Ms. Naik. Such a practice was not the standard operating procedure of HCC's competitive hiring process before Janet May's  and Maldonado's

arrival. After her promotion, Ms. Engle began a personal vendetta to terminate Ms. Epps-Lincoln. For example, she left Ms. Epps-Lincoln out of meetings related to her job duties and responsibilities. One of Ms. Engle's first acts as the supervisor was to tell Ms. Epps-Lincoln, "you will be needing this," and handed Ms. Epps-Lincoln a booklet titled "The Job Hunting Handbook - A Complete Job Search Plan in 48 Easy-to-Read-Pages" by Harry Dahlstrom. As a former member of the HR department, Ms. Epps-Lincoln was very familiar with the tactics of padding Black employee files with exaggerated or false technical policy violations—a practice not as frequently engaged in with White and Hispanic employees. One such example was with a Black employee named Corey Allen. Katherine Engle directly requested that Ms. Epps-Lincoln write-up every possible rule infraction against Mr. Allen. HCC policy required a simple verbal warning instead of a full-fledged written notification in order to allow the employee to correct their actions or behavior. When a White employee, Brian Baldwin, made "mistakes" in the implementation of Taleo training, Ms. Engle did not write him up in the same manner as she had Black employee Mr. Allen for similar perceived shortcomings. The Black male was constructively discharged. A second example with another Black female in the Human Resource Department occurred when Ms. Shirley Parish's personnel file was padded with several ratings of "needs improvement," the same as Kathy Engle attempted with Ms. Epps-Lincoln. These ratings were intended to make Ms. Parish appear incompetent to terminate her in the upcoming months. Due to the continued harassment and discrimination, Shirley Parish was constructively discharged when she was forced to resign from HCC and file for retirement.  Ms.  Epps-Lincoln  was  similarly  discriminated against.

143.    Micalyn Flagg - Race discrimination: Harassment/Policy applied unfairly - Micalyn Flagg is a current 8-year HCC employee serving as a Financial Aid Advisor and Student

Recruiter. She was constructively discharged in August 2020 due to continued harassment and discrimination as a Black employee. In her capacity as Student Recruiter, Ms. Flagg saw discrimination against Black employees and current and prospective Black students. The leadership in her department was Hispanic and favored Hispanic staff. Her supervisor, Dean Martin Perez, a Hispanic male, hired an unqualified Hispanic female as Ms. Flagg's coworker. Dean Perez treated the Hispanic employees favorably and made exceptions to the policy when necessary, including allowing Hispanic employees to attend classes to meet their current positions' requirements.  He did not do the same for Black employees.

144.    Rosalyn Francis - Race discrimination: Denied FMLA and Disability/Forced resignation/Impartial application of HCC policy - Ms. Rosalyn Francis worked in a teaching position at HCC for 15 years. Though she was displaced and qualified for medical leave, Kathleen Anzivino and Rima Adil refused Ms. Francis's FMLA request. They instructed her to return to work or suffer termination. HR informed Ms. Francis that her long-term disability would not be approved, and she must return to work. Having no other options available, Ms. Francis was constructively discharged when she was forced to resign. Ms. Francis was able to teach again at HCC in 2019, but she was only brought in as a part-time instructor though and taught only two classes in the Fall of 2019 before being laid off due allegedly to lack of available courses.

145.    Geraldine Gibson - Race discrimination: Retaliation/Recipient of false/misleading disciplinary complaint and action - In Jan 2020, Janet Harreld, a White female, Director of Continuing Education, gave Ms. Gibson a 50-page Program Improvement Plan (PIP). Ms. Gibson wrote a rebuttal, but it was considered untimely and not accepted. During a Zoom meeting in May 2019, Ms. Alix Alvarado of HR and Norma Petit put Ms. Gibson on administrative leave because she did not notify them that her program was on probation. Ms. Harreld removed Ms. Gibson's

Program Manager. One of the Program Manager's duties was to oversee compliance reporting. It was Janet Harreld's responsibility to notify superiors of the program's status—not Ms. Gibson. It was not until a previous meeting wherein she stated, "as you know, the program is on probation," that she realized they (Norma Petit and Alvarado) were unaware of the program's status.   Ms. Harreld undermined Ms. Gibson's authority with her staff by instructing them to come to her instead of going to Ms. Gibson. Ms. Gibson quietly tolerated Ms. Harreld's harassing, public dressing down, and humiliation, but it became unbearable, and she reported it to EEOC representative Renee Mack.  Ms. Mack told her that a claim was not impossible but would be difficult, so Ms. Gibson decided to focus on the job and forget about the EEOC claim. Notwithstanding, she was made to tolerate discrimination and retaliation based on her race-not her ability to do her job.

146.    Cheryl Goode - Race discrimination: Denied employment opportunities – Ms. Goode applied for numerous positions within HCC for which she was qualified but never received a callback or job offer.  Numerous qualified Black applicants are simply ignored at. HCC.

147.    Brandy Griffin - Race discrimination: Pay disparity/Denied promotion/ advancement/ False/unwarranted disciplinary actions - Brandy Griffin is a long-term employee of HCC's Police Department. Her pay is less than White and Hispanic officers with comparable or less tenure. There are no verifiable guidelines on how to obtain a pay increase. Captain Martinez (Hispanic) and HR members set the salaries and continue to pay Black officers less than their White and Hispanic coworkers of similar tenure and experience. The pay disparity became more evident when HCC implemented its Displacement Plan and changed the pay scales.  Black officers with many years of service and experience earned less than White and Hispanic officers. Black officers are disciplined more harshly for the same or similar policy violations as White and

Hispanic officers. In June 2020, Chief Cunningham placed Ms. Griffin on five-day suspension without pay and revoked her extra job privileges because she asked if an assignment may have been racially motivated. When Black police officers complain to HR, HR sends the complaints back to the supervisors without investigating, which results in further retaliation against the reporting officer. Captain Martinez falsified TCOLE records so that other Hispanic officers could get promotions and pay increases. He was allowed to stay on at the department for months before the department suspended him. In 2019, the department fired a former Black police officer for manipulating time and attempted to file criminal charges against him but took no such actions against Captain Martinez for his falsification of TCOLE records. Ms. Griffin is constantly being retaliated against and harassed by both Chief Cunningham and Captain Boxie.

148.    Afrah Hassan - Race discrimination: Pay Disparity/ Workload Disparity /Retaliation - Afrah Hassan is currently the Associate Dean of Student Engagement and Success at the SW College (Missouri City and Stafford), a position she has held since 2017. In April 2018, Ms. Hassan discovered that her comparable Hispanic coworker earned $8,000 more than she. Ms. Hassan and Dean Garza interviewed Latina King (an African American), two other African Americans, an Asian, and Anamaria Lopez, a Hispanic, for an Enrollment Service Officer position. After the interviews, Ms. Hassan shared her concern with Dean Garza about the candidates' inability to effectively execute the job duties, work performance, and commitment to the position. Latina King, the Black female, had the best interview out of all the candidates, based on her responses and knowledge base.  Anamaria Lopez appeared to know the interview questions beforehand and answered as if she already knew the next question. Ms. Lopez, however, had no prior enrollment services or supervisory experience which was a requirement for the job. HCC rated the candidates on a numbering system. Latina King had the required experience and scored

higher than Ms. Lopez. However, Dean Garza selected Ms. Lopez for the job over the better qualified Black female. Ms. Lopez has advanced to handle duties ordinarily handled by an Associate Dean, such as interviewing new hires. As a result, there are an increasing number of Hispanics with little to no experience being hired in Student Services. These individuals prioritize Hispanic student enrollment and customarily make disparaging comments about Black students. When Hassan complained about the racist comments about Blacks, Dean Garza intervened to clear the Hispanic female that made the disparaging remarks about Black students. Ms. Hassan is being retaliated against for standing against the open racial discrimination at HCC against Black applicants and Black students.

149.    Avis Horde - Race discrimination: Casualty of Transformation/Reduced salary/ Income loss/Denied opportunity to retain to current work status/Loss of retirement income - Ms. Horde began working at HCC on November 21, 1994. On July 25, 2017, Dr. Athos Brewer, Vice-Chancellor of Student Success, Dr. Irene Porcarello (now deceased), formerly the President of the Southeast College, Satrice Morris, Human Resources Representative, and another Human Resources Representative called a meeting with Ms. Horde to let her know that they had eliminated/"transformed" her position. She was not moved to a comparable position even though there were available openings. She applied for 26 HCC jobs and received no offer comparable to her previous job. She took a position earning approximately 50% of her prior HCC salary. At the time of the "transformation," four other people were in the same situation: Dr. Johnella Bradford (Black), Dr. Scott Rinker (Caucasian), Betty Keller (Black) and Sandra Loubier. (Hispanic/Caucasian).  Ms. Loubier was the only one able to keep her position because  her supervisor merely gave her a new job title.

150.    Kim Ingram - Race discrimination: Denied promotion and advancement/Pay

disparity - Kim Ingram is a 13-year employee at HCC with 18 years of student services experience. Despite her background and education, HCC has denied any opportunity for advancement – even when she has served as interim in the positions for which she applied. Ms. Ingram has maxed out on the salary range for her current job and only receives cost-of-living increases. She recently applied for three jobs. Instead of selecting her for any of the positions, HCC selected two Hispanic females and one White female married to an influential Hispanic.

151.    Dawnica Jackson - Race discrimination: Pay disparity/Harassment/Retaliation - Dawnica Jackson was an HCC employee from 2014-2019. Twice, HCC stripped her of management positions and direct reports. Her stipend was half of what others doing similar work received. Others in her department received raises in pay and grade, but hers remained the same. In October 2017, she applied for a position in a new department. Linda Toyota called her the night before the interview and said she would be on the hiring committee. Afterward, Ms. Toyota let others in the office know that Ms. Jackson was looking for a job in other departments. Ms. Jackson reported Ms. Toyota's conduct to Tara Bond of HR. Ms. Bond responded that they were working with Ms. Toyota to improve her management skills. Ms. Jackson later went to Rene Mack and was told that Ms. Toyota was a political hire, and they would not fire her because it would reflect negatively on the Chancellor. HCC's internal EEO representative advised Ms. Jackson that if she went forward with her claims against Ms. Toyota, life at HCC would be difficult. Despite being unanimously selected as the top candidate and recommended by the hiring committee for the Director of Client and Customer Relations position, Norma Perez held up the hiring process because she wanted to offer the job to a Hispanic female. Ms. Jackson was constructively discharged in December 2019.

152.    Rodney Jackson - Race discrimination: Wrongful termination - Mr. Jackson began

his employment at HCC as Manager of Financial Aid Services in 2012. HCC wrongfully terminated him when a false and manufactured claim was filed against him by a disgruntled White employee. The claim was meritless, and the investigator failed to interview all witnesses. Mr. Jackson performed his duties with excellence and served as co-chair of the department. Mr. Jackson's statement was not given the same weight as the White female's statement, given HCC's Displacement Plan's agenda of replacing Black individuals.

153.    Troy Jefferson - Race discrimination: Retaliation termination/Manufactured writeups/Harassment - Troy Jefferson worked at Houston Community College from April 1999 – December 2018 as the Program Director for Recreational Sports and Student Activities' $2 million budget. He discovered improprieties with the student activities and recreational sports fee budget on several occasions. It was common practice at HCC to improperly use the student activity fee budget as a piggy bank. In 2012, the Vice Chancellor, Diana Pino, a Hispanic female, authorized over one million dollars of student fee revenue on a project that HCC had bid $100,000.00. Mr. Jefferson personally asked the Vice Chancellor to cancel the project or explain her decision to the student board, and Ms. Pino refused. The nine (9) member board never approved the $1 million disbursement, which Texas Education Code and HCC policy required. After Mr. Jefferson reported the disbursement impropriety, his superiors placed him on a Performance Improvement Plan to pad his personnel file. In September 2018, he found that roughly $1 million disappeared from the combined student activities fees budget and recreational sports fees budget in violation of HCC policy and state regulations. The nine (9) member board never approved this disbursement. Mr. Jefferson brought the disbursement improprieties to multiple HCC superiors' attention, including Associate Vice Chancellor Carin Hutchins, a White female. Alarmed and shocked by the lack of any upper-level response, he submitted a written letter to his superiors to document the event.

Within weeks of submitting his letter, HCC started termination proceedings against Mr. Jefferson and fired Mr. Jefferson based on Chancellor Cesar Maldonado's approval. When Black employees discover and report improprieties or the illegal use of finances at HCC, HCC management assaults them with a litany of false charges to pad their employee files to set them up for demotions and/or termination.

154.    China Jenkins - Race discrimination: Denied promotion/Pay disparity - Ms. Jenkins worked at HCC for two years as Manager of Faculty and Instructional Leadership Development Services. Though she carried the duties of a director, she was titled and paid as a lesser-level manager. Her counterparts were directors. She requested a job analysis and was denied. Her salary was $15,000 below several of the people she supervised. Ms. Jenkins often observed the disparity in promotions for Black employees as opposed to Hispanic employees. Marica Olivera (a Hispanic female) harassed and bullied other employees and was promoted to Coordinator for Dr. Perez.

155.    Demeita Johnson - Race discrimination: Received manufactured write-ups/Hostile work environment/Retaliation/Harassment/Veteran denied FMLA accommodations/Pay disparity/Forced resignation - Dameita Johnson worked as an analyst and IT Contracts Manager at HCC from 2012 until her resignation and placement on Administrative Leave in 2018. She is a U.S. Air Force Disabled Veteran. Supervisor Bieu Nguyen had a reputation for harassing Black females in his department. Before Ms. Johnson, he harassed Donna Poindexter (a Black female), and she resigned as a result of his wrongful conduct. After Ms. Poindexter resigned, Nguyen turned his attention against Ms. Johnson. Instead of using her first name (Dameita) on official documents and contract, Nguyen used Ms. Johnson's middle name. In 2017, Mr. Nguyen levied excessive write-ups against Ms. Johnson and forced her to take FMLA during her pregnancy. In July 2017, Mr. Nguyen denied her request for ergonomic equipment, which HCC allowed for other male

veterans. Nguyen refused to grant Ms. Johnson a raise and made inferences that she was getting double payment as a veteran and an HCC employee. Ms. Johnson filed a complaint against Nguyen. In February 2018, Ms. Johnson returned from FMLA leave, and Nguyen had her escorted from the building until HR confirmed that she had permission to return. Ms. Johnson was humiliated. Nguyen reassigned the majority of her Office Manager duties to another Asian female and ultimately gave that person Ms. Johnson's position. In March/April 2018, Nguyen retaliated against Ms. Johnson for filing her complaint and wrote her up and gave her a low performance review. Ms. Johnson would apply for other positions within HCC and Nguyen would contact the managers to prevent Ms. Johnson from being hired in the other job positions. Fed up and out of options, Ms. Johnson felt she had no choice but to resign. Nguyen had campus police escort Ms. Johnson from the building on the day she resigned.

156.    Michelle   Johnson   -   Race   discrimination:   Harassment/Retaliation/Denied promotion - Michelle Johnson is a 7-year employee of HCC as an adjunct professor and program director. While working as a grant director, she withstood harassment and retaliation from Dr. Catherine O'Brien (White female) when she did not cooperate with unlawful and improper requests for grant funds to be spent outside the grant's scope. The stress of dealing with a demanding, high-profile grant recipient caused Ms. Johnson to suffer temporary paralysis. Dr. O'Brien reassigned Ms. Johnson's duties to another individual while she was in the hospital and suggested Ms. Johnson apply for another job within the department. Ms. Johnson applied for several HCC positions but never received an interview.

157.    Reginald Johnson - Race Discrimination: Denied promotion/advancement/Pay disparity/Unbalanced application of department policy/ Retaliation/ Hostile work environment - Mr. Reginald Johnson is a current law enforcement officer at HCC with thirty-five (35) years of

experience. Mr. Johnson has been a victim of and has witnessed racial discrimination against Black people at HCC. Police Department management has overlooked Mr. Johnson for promotions on multiple occasions. In 2015, at thirty years of experience, Chief Cunningham gave Mr. Johnson an eighty-nine (89) cent pay increase while he gave Hispanic and White officers substantially more in pay raises and promotions. The excuse from his supervisors and HCC was that there were not enough funds to give everyone a pay increase. There has always been an animus towards Black police officers at HCC; under HCC's Displacement Plan and Chief Cunningham's leadership, the discrimination has been blatant and oppressive. The Displacement Plan has emboldened Chief Cunningham to harass, discriminate, and retaliate against Black officers. Mr. Johnson filed a grievance against his supervisor Chief Greg Cunningham. All officers in the department are aware of the favoritism shown to White and Hispanic officers. Chief Cunningham hired a White male who lied about his status as a military reserve officer to receive additional pay and benefits. Neither the Chief nor HCC took disciplinary action against the Corporal when an investigation revealed and confirmed his lie. The same Corporal left his duty weapon in the men's restroom, and the Chief took no action. However, when two Black officers left their duty weapons in the bathroom, Chief Cunningham terminated one officer and suspended the other. Chief Cunningham hired Corporal James Bailey, a White Officer, even though Bailey had several sexual harassment claims against him, was listed as ineligible for rehire, and did not pass a background check. HCC's HR department had forced John Dziedzic to resign, and Chief Cunningham rehired Dziedzic as a lieutenant despite Dziedzic not passing a background check. Chief Cunningham also turned a blind eye when a Hispanic police officer, Captain H. Martinez, violated clear state law and HCC policy by falsifying the TCOLE system records for Hispanic officers so they could receive higher pay. Martinez's punishment for breaking the law and HCC policy was only a two-week suspension WITH pay.

158.     Andrea Jones  - Race discrimination: Unequal application of HCC policy/Denied promotion and advancement - Ms. Jones was forced to resign due to the hostile working conditions under her supervisor Mary Lemburg, a White female. Ms. Jones endured numerous incidents, encounters, comments, and treatment that were either racially motivated or in retaliation for not breaking HCC policy at Ms. Lemburg's request. Ms. Lemburg would instruct Dana Fields to tell Ms. Jones that overtime was not allowed, and she must remove it from her timesheet. However, her peers had not received the same instruction regarding their overtime. Ms. Lemburg asked Ms. Jones to use her coworkers' notary seals when they were out of the office and retaliated against her when she refused to do so. Ms. Jones also knew of managers doctoring enrollment and graduation numbers. After years of enduring retaliation, including denial of FMLA, Ms. Lemburg was successful in forcing Ms. Jones to resign and retire in May 2019.    Ms. Jones would have worked longer, and earned more retirement benefits, but for Lemburg's discriminatory actions.

159.     Stephanie     Jones     —     Race     discrimination:     Pay     disparity/Denied promotion/advancement - Stephanie Jones has worked at HCC for 24 years in Communications and as a Senior Systems Analyst. Joe Conway (White male) promised Ms. Jones a managerial role when he took over the department, but the promotion never materialized. Mr. Conway also gave Ms. Jones tasks that were not under her official duties, and she received no training. Mr. Conway also took duties away from Ms. Jones and gave them to less qualified White employees. Linda Toyota denied additional training for Ms. Jones in her new capacity, while non-Black employees were regularly allowed to receive training to advance.

160.     Beverly     Joseph     -     Race     discrimination:     Pay     disparity/Denied promotion/advancement/Harassment - Beverly Joseph worked as an Office Manager in the Dean of Health Science department for ten years at HCC. Once, the committee gave the ACE

(Accountability Communication and Ethics) Award to a Hispanic individual even though the individual who collected and tallied the votes stated Ms. Joseph carried 90% of the vote. In 2015 Diana Castillo, Hispanic female, started to intensify her harassment of Ms. Joseph and her Senior Budget Analyst, who was also Black. Castillo informed them that they were not allowed to talk to individuals in the hallway and that eating lunch with  Black faculty members was not allowed. She reported Ms.Castillo  to the HR Generalist for misconduct towards her and other employees. In September, the President removed Ms. Joseph from Diana Castillo's office to the President's office then replaced Ms. Joseph with a Hispanic office manager. In 2017, HR and the President terminated Ms. Joseph based on Diana Castillo's false claims that Ms. Joseph stole a coworker's purse and distributed diet pills—all of which was untrue.

161.    Pandora  Jubilee - Race discrimination: Forced resignation/Harassment/Retaliation - Pandora Jubilee worked for HCC for ten years as a Budget Analyst and Senior Budget Analyst. In 2015, a high student failure rate caused HCC's nursing program to be put on probation; Ms. Jubilee's supervisors ordered her to disburse grant funds to replace faculty bonuses. She refused because it was improper, and her supervisors retaliated and began harassing her. She filed complaints with HR regarding the constant harassment and grant violations, and her supervisors began to limit her role and responsibilities severely. In 2017 Ms. Jubilee applied for the Manager of Budget and Contract Compliance position for the Executive Director of Administration at the Central College campus at HCC. She was completely qualified for the position. Ms. Jubilee completed two interviews, and the HR contact instructed her to await the results of a background check. She had cleared the selection and interview process, background check, and had experience at HCC and the systems in place. Nonetheless, Dr. Perez (Hispanic)  informed Ms. Jubilee that a Hispanic individual had filled the position, but they would consider her if that person did not work

out. The individual hired had direct relationships with other Hispanic leaders at HCC. Ms. Jubilee was shocked by the blatant racism shown by Hispanic individuals but was powerless to do anything about it. Ms. Jubilee retired from HCC under duress and extreme stress from dealing with HCC's misuse and unlawful use of grant funds.

162.   Betty Keller - Race, gender, and age discrimination: Retaliation/ Transformation/Denied Advancement - Betty Keller worked for HCC for 33 years as a Retention Specialist and professor. In May 2017, HCC "transformed" her position. Dr. Maldonado executed a mandate to assign employees within their academic field. Since Government and Business were in Ms. Keller's credentialed and certified academic areas, she contacted Dr. Norma Perez/Interim Vice-Chancellor, a Hispanic female, and inquired about a teaching position specifically in both of those disciplines. Dr. Perez stated that no vacant positions were available in either discipline and advised Ms. Keller to apply for an Advisor position. Dr. Perez had previously led an investigation filed by Ms. Keller into the hostile work environment created by one of her male Hispanic coworkers. Dr. Perez favored the male coworker and further humiliated Ms. Keller by stating the allegations were unsubstantiated. Dr. Perez made Ms. Keller the violator, accused Ms. Keller of improper, unprofessional, and unethical behavior in the workplace, and prohibited Ms. Keller from teaching or interacting within the Drafting Department.  HCC ultimately terminated Ms. Keller.

163.   Elamees Kelly-Molo - Race discrimination: Denied promotion/advancement - Elamees Kelly- Molo worked as adjunct Faculty at HCC from 1992 – 2020. She has applied for numerous positions at HCC. Instead of hiring her, HCC has hired other less qualified Hispanics and Whites. She applied for a full-time sociology faculty position, but HCC hired a White female for that job.

164.   Terry Kidd - Race discrimination: Retaliation/ Denied Advancement/

Transformation /False-Misleading write up - Terry Kidd generated millions of dollars in revenue and grants, grew enrollment, developed programs, published ten books, published 15 research papers in tier one academic journals, and received more than seven awards and high honors during his 10-year tenure at HCC. Under the guise of "transformation," HCC "transformed" Dr. Kidd's position. He then applied for five director positions, and HCC refused to select him. HCC gave each of the  positions to less qualified Hispanics and Whites. During the hiring process for Dean of Division of Extended Learning, Madeline Burillo, a Hispanic Associate Vice Chancellor, tried to fix the screening committee to select Matias Garza, a Hispanic candidate, for the deanship position. It ultimately failed, and Dr. Kidd was offered the position. Eventually, Madeline Burillo became President at HCC's Southwest College and forced a Black man by the name of Dean Sippey out of his Dean of Students position and gave the post to Matias Garza, a Hispanic male who was unqualified for the position. Dr. Kidd was treated differently from other White  and Hispanic managers who were allowed resources, office managers, and faculty. In contrast,  Black staff members were removed from Dr. Kidd's leadership to other departments. In 2020, HCC management forced Dr. Kidd out.

165.    Elfreda King - Race/Age discrimination – Ms. King's HCC manager refused to provide her with necessary training needed to be successful in her job. Her manager created a hostile work environment, raised her voice numerous times, made fun of and laughed at Ms. King when addressing other employees, and abused her power and authority over Ms. King. Ms. King experienced retaliation for turning in her coworker to HR. Therefore, she raised a grievance for unjustifiable termination, emotional harassment, hostile work environment, and age discrimination.

166.    Latina King - Race Discrimination – Ms. King worked at HCC from October 2014-

2017 as an enrollment associate, helping students throughout the admission process. She had over ten years' experience in this field. There was an available enrollment officer position above her. The enrollment officer position was given to a younger Hispanic female with no experience or credentials. The job was given to her by a newly appointed dean who also was Hispanic. The new Dean shared with others that he would never give the position to Ms. King or another Black female who worked at HCC before Ms. King. The young Hispanic female (Anna Maria Lopez) was allowed to leave work early to attend school to acquire credentials she needed to hold the position she had been improperly granted without required qualifications. Ms. King complained to the HCC HR department and heard nothing back. She then went to the EEO office at HCC with the complaint and did not receive a response. She then reported this discrimination to the EEO office in Dallas after she was informed that the Houston EEO office had members working there to cover up HCC's misdoings. The Dallas office told her that she was required to file in Houston. After verifying with the HCC HR department, the Houston office dismissed the claim that the young Hispanic female did not have the necessary skills/credentials for the position, even though she did not. Ms. King then met directly with the Hispanic male Dean (Mathias Garza) in charge of hiring, and the Dean told her that she needed to get over it as she was just mad she did not receive the position. He also ordered her to train the young, unqualified Hispanic female so that the Hispanic female could become her supervisor. With all available options exhausted to her, and faced with the prospect of further exposing herself to the toxic and discriminatory environment at HCC under the Maldonado Displacement Plan, Ms. King resigned her position.

167.    Edna Kingsley - Race Discrimination – Dr. Kingsley has not been promoted to full-time tenure. Hispanics with master's degrees were moved into interim positions then put into those positions full time. She has applied for several positions and was not even given an interview. She

felt that she should have at least received an interview. Each year HCC tells her that her current position will be budgeted for a full-time position, but it never is. All of the positions she has applied for she has never received even an interview or opportunity to compete with other Hispanic and White candidates. Further, since she was a long-standing employee of the College, she had actual knowledge of the qualifications and experience of some of the candidates interviewed for the various positions. She also knew some of those candidates who were eventually hired in the positions, and their education, experience, and qualifications did not equal or surpass Dr. Kingsley's qualifications. Instead, these individuals were placed in full-time and executive positions because of their Hispanic descent. She looked at her employee file last summer to see if something in her file possibly discredited her but there was nothing other than the color of her skin.

168.    Donny Leveston - Race Discrimination– Department Chair Ainsworth never implemented any of the accommodations Mr. Leveston requested. He became permanently disabled, and the department chair has refused to accommodate his disability. Tom Anderson refused to look at his request for accommodations. Also, he applied for a position and ran for Department Chair of Humanities. However, at the spur of the moment, the Department Chair added another individual and that individual (Paris) was hired and became her husband's direct supervisor. Donny complained and was granted a meeting with Tom Anderson and Steve Lee. Instead of giving him the job, Tom Anderson and Steve Lee appointed an individual to the position. In 2017, Mr. Leveston applied to the Honors College and there were three finalists to fill that post. Cheryl Peters (a white female) hired Scotty Moore (a white male) for the position. She explained that she hired Scotty Moore because he had done more for the school. Eventually, it was found that Scotty Moore lied on his CV, and he was temporarily removed from the position. Instead of

promoting Mr. Leveston, they brought Wilcox (a white male) in as Director. Mr. Leveston has always been the second or third finalist but has never been able to get past that round. Donny applied for a Consumer Resources Deanship, but another individual was hired instead. 2014 – 2018– Four years in a row— he has requested to take his veterans to DC, and his request has been repeatedly denied. Yet other student groups are granted permission for field trips. In 2018 and 2019, several faculty members called the HCC Police on him for looking "suspicious" even though he was professionally attired.

169.     Conrad Levy - Race Discrimination/Harassment/Pay Disparity – Conrad Levy is a police officer with the HCC police department. He wrote a letter to Sgt. Bailey and contacted Sgt. Anderson so that Officer Levy could be admitted to the rifle team. However, he was denied because he did not qualify as he needed to take the TCOLE shotgun class. He was not allowed to select the dates for his TCOLE class training, whereas other Hispanic officers were permitted to select the specific dates they wanted to attend. On February 27, 2020, he requested a vacation day and was denied on the same day. He reached out to Officer Antonio Coto (Hispanic) to clarify why he kept getting his vacation days rejected. Coto's response was, you cannot choose your alternative holidays. Later that same day, he went to Pace and noticed that another non-Black officer put in for his alternative holiday and it was approved. On August 19, 2020, Sgt. Johnson called Mr. Levy into the office to discuss his facial hair. As a  Black individual, Mr. Levy suffers from certain skin conditions that make shaving painful and causes issues with his skin. The next day Mr. Levy contacted his primary care physician to make an appointment. He visited his Primary Care Provider on August 26, 2020, and upon leaving was given a note to give to his employer identifying his skin condition. Mr. Levy gave the doctor's note to his supervisor, Lt. Lance Side. A week later, Captain Boxie scheduled an HR meeting on September 2, 2020 at 4:00 P.M. HCC's HR department stated

that Mr. Levy had 30-45 days to see a dermatologist about his skin condition. They would meet again on October 19, 2020, to discuss the results. They would not accept the note from his primary care provider. On September 10, 2020, Mr. Levy received a letter from HR stating that if they were not satisfied with his dermatologist's findings, they would send him to a doctor of the College's choosing. Furthermore, Officer Levy has requested multiple times to obtain additional training for his job in hopes of advancing within the department. However, Officer Levy has noticed that the same groups of Hispanics, Juan Zavala, Jeraldyn Jimenez, and Antonio Coto, always attend training. In contrast, he has met nothing but resistance. The individuals mentioned were sent to training and were paid for going. Such disparate treatment between how he is being treated and how similarly-situated Hispanic officers are treated can only be explained by a difference because of race.

170.    Marlene London - Race Discrimination: Forced resignation —When Janet May arrived at HCC, Marlene experienced constant racial bias. Marlene was denied the standard monthly additional duty stipend for her leadership role in the design, implementation, and management of the Personnel Assignment Management System (ePAMS)--an electronic assignment and pay system for Faculty and part-time employees. Marlene was told by her Executive Director, Kathleen Engle, a white female, to watch her back because Janet May had indicated she would fire her. Marlene worked two college assignments, NWC and NEC, for 1-year (in addition to ePAMS) and was denied additional duty pay which was customarily paid for such extra duties and which were being paid to peers when they worked similar additional duty assignments. Marlene lost the opportunity to retire with only four years remaining. Faced with full-time unemployment for the last 11 months with no benefits; a 35+ lucrative career as an HR professional wiped out, Marlene was removed from teaching in the Government department with

no investigative report warranting this adverse employment action.

171.   Damita McClain - Race Discrimination/Denied equal work provisions and opportunity/Retaliation – Damita was diagnosed with cancer in 2016 and had to go through radiation. She was also allergic to dust, dust mites, and carpet. She repeatedly asked to be moved into a new location to help her health, but she was not provided assistance. She wrote to the Chancellor and was moved to a new office but was retaliated against upon her arrival. She asked for an air quality check but was denied. The new location was worse than the prior location. If a Hispanic person did not get along with a fellow employee, or were having any issues, they would be allowed to move to other areas without recourse. In her current area, a Hispanic male (Jose) worked in the Acres Home location with a smaller caseload of students than Ms. McClain. He was allowed not to have a caseload so that he could work with students. But, when she inherited his responsibilities, she was told that she had to advise and work with the students as well as do the work. She called HR to discuss these discrepancies and never received an answer about why she was being treated different from the Hispanic employee. Jose was eventually given a promotion, which resulted in Ms. McClain being forced to work at a campus with a heavier workload than Jose, but with less pay and no promotion.

172.   Marcus McNeil  - Race Discrimination/ Pay Disparity –Marcus McNeil is a law enforcement officer with HCC and has been employed there for more than nine (9) years. Similar to other Black police officers at HCC, Mr. McNeil is paid less than White and Hispanic officers with the same or lesser seniority. The pay disparity became further evident once the pay scales were changed. This resulted in Black officers with longer tenure at HCC earning less than White and Hispanic officers with less experience. Mr. McNeil has also witnessed the preferential treatment afforded to White and Hispanic officers where policy violations are concerned. Black

officers are disciplined more often and more severely for the same policy violations compared to their White and Hispanic coworkers. Any complaints by Black police officers to HR are sent back to the supervisors that are likely engaging in the harassment, resulting in further retaliation against the reporting officer. Mr. McNeil has been wrongly disciplined for policy infractions that did not occur, which diminished Mr. McNeil's opportunity for promotions and other employment benefits. Due to the constant harassment and discrimination at HCC, Mr. McNeil suffers from hypertension and mental stress, for which he has been undergoing treatment with his physician.

173.    Lue Mims - Race Discrimination— Ms. Mims was advised she was not qualified for the position she is currently performing. The change was supposed only to be a title change, not a duty change. Ms. Mims has been with HCC since 2014. Her managerial duties were taken away and she was replaced by a younger, unqualified individual. Ms. Mims has conducted her duties faithfully and diligently; nevertheless, she faces continual harassment and retaliation to force her to resign or face inevitable termination. Ms. Mims remains in constant fear of being unjustly harassed until she is terminated, similar to the conduct to which other Black individuals have been subjected. Ms. Mims has witnessed the advancement of unqualified Hispanics to management and leadership levels, where they have created hostile work environment, particularly towards herself and other Black individuals.

174.    Ricardo Modeste - Race Discrimination/Harassment/Wrongful Termination— Mr. Ricardo Modeste is a former HCC employee that worked as a Senior Lab Assistant and was forced out of his employment at HCC in May 2019, after working there from 2011. Due to his appearance, Mr. Modeste was mistaken to be of Hispanic origin, but once his ethnicity as a Black person became known, he was subjected to the same discrimination that other Black employees at HCC were facing. In May 2019, Mr. Modeste was removed by HCC police officers when another HCC

employee claimed that he was causing her stress. The allegation was never proven. Before being removed from HCC, Mr. Modeste continually faced harassment from supervisors and coworkers based solely on the fact that he was Black. His work product was reviewed continuously and criticized for minor errors that were also going unnoticed in Hispanic employee's work product. In meetings, Mr. Modeste was regularly screamed at and talked over, and this created an atmosphere of constant intimidation and retaliation for him. While he was at HCC, Mr. Modeste frequently suffered from anxiety in his interactions with the department and campus managers, particularly when he was identified as Black as opposed to Hispanic.

175.    Krishna Morancie - Race Discrimination: Pay Reduction/Wrongful Termination— Ms. Morancie worked at HCC as an Enrollment Specialist. She was wrongfully terminated when a Hispanic coworker falsely alleged that she was not completing the assignments tasked to her. This allegation was false, but her supervisors did not conduct a reasonable investigation of the allegations and terminated her employment.  Due to her Hispanic coworker's false allegations, and the incompetence of her supervisors in failing to conduct a thorough investigation, Ms. Morancie was fired because HCC listened to a Hispanic voice over that of a Black voice. After Ms. Morancie's termination, she filed a complaint with her immediate supervisor, and she was never given a response, let alone the opportunity to clear her name. Ms. Morancie's termination adversely affected her ability to obtain employment, and the stigma follows her to other places of employment.

176.    Miesha Mosley -Race Discrimination: Harassment/Forced Resignation — Ms. Mosley is a former HCC employee who resigned from her position due to constant harassment from her direct supervisors that prevented her from faithfully completing her duties. She started her employment at HCC in 2010 in the HR department and continued there until her resignation.

She held the position of HR Lead Administrator during her tenure. She was often directed to make exceptions to HCC and HR policies. These policies were subjectively changed to benefit Hispanic and White employees and adversely when they involved Black employees. Janet May was one of Ms. Mosley's supervisors, and Ms. Mosley was told by Janet May to circumvent HCC policies for individuals May favored. HCC also hired a manager to supervise Ms. Mosley's department, who was unqualified for the position and did not have the requisite experience needed for the position. The unqualified supervisor, under directions from Janet May and others, began a policy of harassing and retaliating against Ms. Mosley in an effort to end Ms. Mosley's employment. Faced with the prospect of eventual termination, and to avoid further embarrassment and stress, Ms. Mosley tendered her resignation. Prior to leaving HCC, Ms. Mosley was aware of the discrimination that was leveled against Black employees and the preferential treatment being afforded to White and Hispanic employees by HCC supervisors and throughout the organization as a matter of policy. In Ms. Mosley's case, she was singled out for not following policy when that was not the case. She suffered the sting of HCC's discriminatory policies and practices directed at Black employees. In one instance, Ms. Mosley's supervisor, Maureen Pollo, publicly berated Ms. Mosley in front of other coworkers and HCC staff. Conduct like this was never directed at Hispanic employees. Ms. Mosley's role at HCC was undermined in various manners, including diminishing her presence on the HCC website for her department while promoting Hispanic employees. In June 2020, Ms. Mosley was given lower ratings by her supervisor Ms. Pollo, in an effort to pad her personnel file for eventual termination.

177.    Ameenah Muhammad - Race Discrimination/Job Reduction/Pay Reduction — Ms. Muhammad is an adjunct professor at HCC. She has been teaching since 2012. Throughout 2018-2019, Ms. Muhammad was also paid separately for helping to write and develop a curriculum for

HCC's online college. In 2019, Ms. Muhammad received a call from her prior program manager, Yoshkiko Fields, a  Black male, who informed her that "he had nothing do with it." At the time, Ms. Muhammad was not sure what he was talking about, but a short while later, she came to learn that one of her online classes had been removed from her and given to another teacher, Ms. Rosa Cruz, a Hispanic female. When Ms. Muhammad pressed her HCC supervisors for an explanation, she was informed that she was being "displaced" because she did not help build the curriculum and that Ms. Cruz worked really hard on the curriculum and should "be rewarded." After explaining that she worked on the curriculum as well and was even paid separately for it, Ms. Muhammad was told by Janet Herrald, a White female, that they "needed to spread the wealth that they have to bring in new people." Ms. Muhammad was shocked. Her class had been taken away from her for absolutely no reason. As an adjunct professor, Ms. Muhammad is paid hourly rather than by salary. The number of classes she teaches directly impacts her income.  The Hispanic "replacement" was not more qualified than Ms. Muhammad.

178.    Mary Page - Race Discrimination: Forced Retirement— Ms. Page became a witness and victim of the "transformation program" instituted at HCC when the counseling department became the focus of that "program." When faced with the challenge of reapplying for a position she had successfully held for more than three (3) years, she elected to retire. She chose to retire because it became unbearable to stay any longer at HCC and suffer the discrimination and harassment she and other Black colleagues were facing on a daily basis. Specifically, she and other Black individuals were constantly denied the opportunity to interview for or be selected to fill positions that eventually went to less qualified Hispanic individuals—candidates which either had no experience, less education, and/or fewer years of service in the positions for which they were applying than Black applicants.

179.    Shirley Parish - Race Discrimination—harassment/hostile work environment. Ms. Parish is a former HCC employee who resigned from her position due to discrimination, harassment, and retaliation. Her last position at HCC was as "Manager HRIS Quality Assurance." By all accounts, Ms. Parish was an outstanding employee until she was subjected to a hostile work environment by her supervisors, Hina Naik, a non-Black female, and Janet May, a white female. Ms. Naik was Ms. Parish's direct supervisor since 2013 and managed Ms. Parish and others in the department with an iron fist, further emboldened by Janet May. Ms. Naik created a negative and oppressive environment for her subordinates and terminated or forced out a number of  Black employees. Ms. Naik constantly harassed Ms. Parish and once even publicly berated her in front of the entire IT department. Ms. Naik was known to regularly mistreat and disrespect her Black subordinates. When employees complained to Janet May, no action was taken. In one instance, after receiving an unwarranted negative performance evaluation from Ms. Naik, Ms. Parish filed a complaint with the Equal Employment Opportunity department, an internal department of HCC. Ms. Parish was advised to meet with Janet May. Ms. Parish knew that Ms. May would take no action to resolve the conduct and chose to tender her resignation. Had it not been for the unrelenting abuse from Ms. Naik, with Ms. May's  accommodation, Ms. Parish would have continued in her employment at HCC until she could retire in 2021.

180.    Cynthia Patton - Race Discrimination: Reduced Job Responsibility/Forced Retirement — Ms. Patton worked for Houston Community College for over 11 years until being "transformed" in September 2020. The Tax and Finance Compliance Department opened five years ago, and in that time period Ms. Patton and Plaintiff Frederica Watson, another Black female, were both transformed.  Both of these plaintiffs worked extremely hard to develop a highly functioning and thriving department with automated processes, developed and implemented

exclusively by these two Plaintiffs. Their supervisor, Carin Hutchins, a white female, provided little to no leadership nor did she embrace the department elevating it to the level promised at the creation of Tax and Finance Compliance, and caused both Ms. Watson and Ms. Patton to face an onslaught of discriminatory practices. When Ms. Hutchins arrived, Ms. Patton felt immediately devalued by her lack of interest in the department's day-to-day operations as the Associate Vice Chancellor. She took no interest in the department and made no attempt to work with either Ms. Watson or Ms. Patton. Ms. Hutchins never reassigned the other tax functions to the department as had been promised. The other tax functions consisted of 1099's, 1098's, 940s, and any other tax functions the college encountered. At times, Ms Hutchins would assign tax functions to the Accounting unit, which comprised mostly of White and Hispanic employees, knowing that such functions should have been assigned to the Tax and Finance Compliance unit. Then when it was announced that Ms. Hutchins would be eliminating the department altogether and not reassigning Ms. Watson or Ms. Patton to new positions. the reason given was that the Tax and Finance department was not suitable for a 2-year college.  However, that was not the logic used a few years earlier when the department was created, and when Ms. Watson and Ms. Patton were moved into the department. Out of the entire Tax and Finance transformation plan only the Black employees were displaced. After the transformation was completed, Ms. Hutchins left the college two weeks later. As part of the Transformation she also eliminated two other older BLACK women's positions in the Student Accounting unit. One of the ladies was over 65, and one was approximately 59, all long-term employees having worked for HCC for 15-20 years. All three of these Black employees were forced to leave.

181.    Wilma Perkins -   Race   Discrimination:   Demotion/Salary   Reduction/Forced Retirement – Dr. Wilma Perkins was an HCC employee who worked there for nearly twenty-five

(25) years before her position was "transformed" to a lower position with a reduced salary thereby forcing her into early retirement. Dr. Perkins began working at HCC in April 1992 in the Financial Aid department. Her last position was "Financial Aid Manager" at the Southwest Campus. The department was reorganized, and the positions were "transformed." This resulted in all the employees reapplying for their positions, albeit with new titles, but the duties remained the same. When the positions were advertised, Dr. Perkins applied for and was interviewed but was not offered a position, despite repeated assurances from Ms. Saucier, a White female, that Dr. Perkins' job was safe. The positions ended up going to younger individuals with less experience and qualifications than Dr. Perkins. At least one position went to a Hispanic individual, Lisa Chow. There was a position available for "Financial Aid Officer," but that position too went to another Hispanic female, Ana Marie Lopez. Ms. Lopez was later promoted to "Assistant Dean." All of the individuals that retained their positions, or were promoted, were less qualified and had less experience than Dr. Perkins. In February 2016, Dr. Perkins was informed that she would be demoted from her current position and receive a deduction in pay. If Dr. Perkins did not accept the demotion, then she would be terminated once the position she occupied was closed. Disheartened and at risk of losing her retirement benefits the only viable option was to consider herself constructively discharged from the College.

182.    Beverly Perry - Race Discrimination—Dr. Perry experienced years of mistreatment, insults, and was demoted from the Biology Chair, and was passed over for promotion. Dean Dr. Tom Loesch, a white male, caused all of the changes in Perry's position. Perry's email account was moved to the SW area server to check her emails and erase them when she complained about her treatment. Hispanics and Whites were never treated som disrespectfully.

183.    Gertrude Perry-Ridley - Race Discrimination/Hostile Work Environment—Ms.

Perry-Ridley was required to reapply for her job under "transformation" in an attempt to get her and another tenured colleague to retire/resign. Numerous experienced and qualified Black colleagues were routinely passed over and positions systematically filled by less-experienced/qualified Hispanics. Ms. Perry-Ridley was working in a counselor's position until the transformation. The first reorganization required all counselors to obtain a Licensed Professional Counselor (LPC) certification. At the time, there were no documented specifications or guidelines given to the counseling department other than obtaining the LPC certification. Ms. Perry-Ridley already had this certification before the requirement was imposed. After some time, she was informed that her LPC certification would not be recognized by the College because it was not issued in the state of Texas and she suffered adverse employment actions thereafter.  Similar mistreatment was not imposed on White and Hispanic coworkers.

184.    Sheila Quinn  - Race Discrimination: Harassment/ Hostile Work Environment/ Forced Resignation — Ms. Sheila Quinn is a former employee of HCC who resigned from her position because of racist treatment she experienced at the College. At the time of her departure from HCC, Ms. Quinn was working as a manager in External Reporting at the Southeast College. In this position, she was excluded from group lunches and meetings with the COO and office manager; denied flexible arrival time while a fellow White co-worker with the same situation was granted flexible arrival times; refused an assigned parking space even though her position warranted a parking space; suffered unequal pay as compared to a white male that had the same role and duties and she. Additionally, Ms. Quinn was granted a promotion but it was revoked and given to a Hispanic male after the President, also Hispanic, placed a call to stop her hire.

185.    Ernest Reynolds - Race Discrimination: Pay Disparity/Role Reduction—Mr. Reynolds worked at HCC for over 30 years, from 1983 until his job's transformation in 2018. Up

until his forced ouster, he held the position of Director of Educational Technology Services. Without notice, the former position as Manager of Simulation Center was "transformed" to a Student Services position by the current College President (Dr. Philip Nicotera, a Hispanic male). The duties and responsibilities were outside of the job description scope of Mr. Reynolds's new position. He was placed in a very awkward position since Coleman College actively involved the planning and design phases with the architects and program managers for the new ten-story building that included a much larger Simulation Center. Although the work was clearly outside his new employment scope, Mr. Reynolds was never offered or paid any stipend for work outside his job description for years, as was required by HCC policy. Mr. Reynolds later found out that two of his peers with the same job description were being paid extra stipends for assignments or functions outside of their job description (they were both White males). Mr. Reynolds asked the College President about the missing stipend and was told that the Simulation Center Management was part of his job description and could fall under "other duties as assigned." When Mr. Reynolds met agains with the President  about his job description, the President became agitated and told Mr. Reynolds he would rewrite the job description and include the Simulation Center Management within it to avoid paying the stipend.   Mr. Reynolds's department began going through "transformation." There were six employees across the HCC district with the same title and job description as Mr. Reynolds (two White males, two White females, one Latina female, and Mr. Reynolds, the only Black). HCC transferred the positions from reporting to the College Presidents to a district-wide department, the six jobs becoming three regional positions, forcing the employees to compete with internal and external applicants for those positions, apply for a different position, or be terminated. One White male resigned, and the other White male got another job within HCC before the consolidation. Only the Latina female was retained. At the time of his departure, Mr.

Reynold's salary was $106k, the lowest paid of all directors even though he was there the longest. Mr. Reynolds suffered racial discrimination while he worked at HCC and as a result of his position being "transformed" leading to his leaving HCC.

186.    Kristen Rhodes - Race Discrimination: Pay Disparity, Harassment—Ms. Rhodes was constructively discharged from her position at HCC due to constant harassment and discrimination she was forced to endure under her Hispanic supervisor. Prior to her constructive discharge, Ms. Rhodes had been a dedicated employee of HCC for over six (6) years, and had applied for promotions but was overlooked in favor of White and Hispanic applicants. Ms. Rhodes was subjected to constant badgering, retaliation, and discrimination from her Hispanic supervisors. She was also subjected to pay discrimination as she was paid significantly less than her coworkers, even though she had the same, if not more, experience and qualifications as those coworkers of a different race.

187.    Erica Rhone - Race Discrimination: Bullying/Harassment/Pay Disparity— Ms. Rhone moved into the Financial Aid Department because her previous department was dismantled. She has had issues with Joellen Saucier (white female; Executive Director of Financial Aid), who has bullied and verbally abused her. Ms. Rhone filed grievances against Ms. Saucier, and nothing was done. She asked to be moved out of the department, and Karen Hutchins, a white female, would not move her from the department. Ms. Rhone filed grievances with HCC's HR and EEO. She told HR that she feels harassed and threatened. However, as Janet May and Joellen are personal friends, nothing was done about the situation. Furthermore, Ms. Rhone has a master's degree, but non- Black new hires with bachelor's degrees earn more than she earns.

188.    Carrie Robinson - Race Discrimination: Harassment/Bullying– Ms. Robinson worked at HCC in various positions from 1999 until she was wrongfully terminated in October of

2016. In 2014, she started working for Vicki May, a white female, in the Division Chair of Emergency Medical Services department as the Divisional Secretary. When Ms. Robinson first started working for Ms. May, she had to scramble to clock in because Ms. May or someone under Ms. May would be working on Ms. Robinson's designated computer. HCCS had a policy that employees could only log into their respective work areas, but Ms. May did not adhere to this rule. Ms. May would also make racial statements around Ms. Robinson, such as "she had some flogging to do upstairs" regarding students she claimed she needed to get in shape and that she has to "practice tying her nooses." Ms. Robinson became pregnant in 2016 and, per her Doctor's orders, required some minor accommodations in order to safeguard the pregnancy and her child's health. Ms. May disregarded the medical directive.  Rather, she had Ms. Robinson work in a dusty storage room and asked her to carry out physical tasks against her doctor's orders. Ms. May told Ms. Robinson that "it's not going to kill you or the baby." Later in that year, Ms. Robinson submitted a leave request to attend her Aunt's funeral. However, Ms. May tried to block the request. According to HCCS' policy, Ms. Robinson would be allowed to attend the funeral as long as it is an immediate family member. Nonetheless, Ms. May threatened to fire Ms. Robinson if she left. The following month, Ms. Robinson's doctor filed her FMLA papers in July 2016 so that Ms. Robinson could remain on bed rest until delivery of the baby in January 2017. While she was on Intermittent FMLA and Maternity leave, HCC filed papers to terminate her employment. They also demanded she come to work so they could fire her while at the workplace. White and Hispanic employees were not treated this way at HCC.

189.    Katherine Robinson - Race Discrimination: Pay Disparity—Ms. Robinson is an HCC police officer and has been facing racial discrimination since 2014. She has applied for, and had interviews with the Chief, for a supervisor position after she was recommended by the manager

for the position.  She was turned down without reason. She has applied for the position of Dispatch Supervisor more than four times since 2014, and although she is qualified for the position, she has not been offered an interview. She also receives a lower salary for the same job duties compared to other similarly-tenured White and Hispanic officers.

190.    Felicia Rucker-Carter -    Race    Discrimination:    Harassment/Retaliation/Pay Disparity — Ms. Rucker-Carter has been at HCC for almost 23 years and has been in the Police Department for 13 years. She has never received a raise in the police department despite Hispanic officers with less experience receiving salary increases. There have been several Hispanic officers in that timeframe who were hired with fewer years of service that are making $60,000 or more a year. Ms. Rucker-Carter only makes $52,000. In 2013, she was injured working a second job. HCC PD refused to allow her to file workers' compensation. Ms. Rucker-Carter sued HCC for violating her right to file a worker's compensation claim. As a result, there was a change to the internal policy of denying workers comp for second jobs. After filing her lawsuit, she was moved back and forth between her campus and the 3100 Main building as retaliation. Her schedule was often changed, although it was understood that most officers would keep their schedules. Hispanic Officer Vasquez was injured, and they made arrangements for her to do roll call, etc. Martinez and Cunningham kicked her out of roll call and put her at the front desk. They would refuse to allow her to make up time missed as a result of her therapy. HCC Police Department claims there is no light duty for anyone unless you are on worker's compensation even though they provide light duty options to some Hispanic and White officers. She also faced discrepancies with salary, sick time, and time off compared to other non-Black officers.

191.    Rose Russell - Race Discrimination: Constructive Discharge due to Transformation —Ms. Rose Russell had over twenty-five (25) years of service with HCC when her position was

"transformed." When her position was "transformed" in 2017, she was constructively discharged because the new position would substantially reduce her pay and, further, adversely affect her retirement benefits. Ms. Russell's position was "transformed," and the same duties she previously performed were not the same for the new employee. The "transformation" excluded her from enjoying benefits that she otherwise would have enjoyed had she not been forced out of HCC.

192.    Victor Seaborn - Race Discrimination: Denied Promotion/Advancement/Income Loss/Retirement Loss/Constructive Discharge—Mr. Seaborn is a former employee of HCC. He was constructively discharged from his position in 2018 after nearly twenty (20) years with the College as a result of the racial discrimination he and other Black employees were experiencing at HCC. Mr. Seaborn started working at HCC in 1999 and progressively moved up the organization to the "Lead Campus Technician" position at the time of his departure. While at HCC, he excelled in the various positions he occupied. However, he was never allowed to become a manager. His supervisor, Jim Livesay, a White male, told Mr. Seaborn on several occasions that Livesay would not have hired Mr. Seaborn, and preferred hiring a Hispanic person instead. Mr. Seaborn also experienced racial discrimination when Livesay provided preferential treatment of Hispanic individuals that he did not afford Black employees. One such example involved Ismael Rodriguez, a Hispanic male, who was in a similar position as Mr. Seaborn. Livesay favored Rodriguez in assignments and replaced Mr. Seaborn with Rodriguez from Executive Support, despite Mr. Seaborn providing excellent service over all the years he performed those duties. Furthermore, when the "transformation" began, Black employees were generally being paid less than their White and Hispanic counterparts. Mr. Seaborn was also actively discouraged from applying for management positions. When he applied for such positions, he was not interviewed even when he met the qualifications for the positions. When Mr. Seaborn sought advice on advancing his career

at HCC from a superior, Charles Cordero, a white male, he was told that the manager positions required previous managerial experience. This was false and not listed as a requirement for the positions for which Mr. Seaborn applied. Facing the insurmountable odds and stress of working in his position, and with no further prospect for advancement, Mr. Seaborn was constructively discharged in September 2018.

193. Yolanda Simmons-Moore - Race Discrimination: Denied Promotion/ Advancement/ Hostile Work Environment/Harassment/Income Loss/Retirement Loss—Ms. Simmons-Moore is a current HCC employee that began her career at HCC in 1989 and currently works as an "Enrollment Services Assistant." She has held that position since February 2020. Before the present position, Ms. Simmons-Moore worked as a "Senior Administrative Assistant" with the Adult Education and Literacy Program, located at the administrative offices of HCC. While working as a Senior Administrative Assistant, Ms. Simmons-Moore worked under Dr. Christina Robinson, a wWhite female, who regularly harassed, discriminated against, and retaliated against her because Ms. Simmons-Moore would not violate HCC policy. Dr. Robinson created a hostile work environment for Ms. Simmons-Moore by making it difficult for her to complete her duties, preventing her from accounting for discrepancies, and hampering Ms. Simmons-Moore's ability to be overall successful in her position. This type of conduct was not directed at anyone else and appeared to be racially motivated to terminate Ms. Simmons-Moore. Dr. Robinson would also fabricate expenses to meet her needs without providing valid justification. When HCC finally discovered Dr. Robinson's spending extravaganza, she was required to attend a class on financial spending, had her authority to access funds limited, and was disciplined by HR. Dr. Robinson held a grudge against Ms. Simmons-Moore for not helping cover her malfeasance and subsequently wrote Ms. Simmons-Moore's position out of the financial grant

for the 2020 fiscal year.        Thus, ending her employment.

194.    Sonya Sneed - Race Discrimination: Denied Promotion/ Advancement/ Demotion/ Income Loss/Retirement Loss/ Constructive Discharge—Ms. Sneed is a former HCC employee who was constructively discharged. She worked at HCC between 2006 and 2018, and her last position was as Life Center Manager. Prior to the "transformation," Ms. Sneed applied for multiple positions that she was well qualified for, only to learn that the position was given to an unqualified White or Hispanic individual. One such position was for the Director of Dual Credit. Ms. Sneed applied for the position in 2016 because she was the most qualified applicant for the position. Ms. Sneed was successful in her first and second interview and was sure she would be offered the position, only later to learn that the position had been given to a White female who was less qualified for the position. In another instance, at the direction of Dr. Harmon and Mr. Wilson, Ms. Sneed was directed to write a proposal for a new position with a new title and duties that would be given to Ms. Sneed to manage the gym at HCC; however, Ms. Sneed later learned that this particular position was given to Caprice Dotson, another White female. As a result of witnessing these inequities, based solely on her race, and despite her qualifications, Ms. Sneed later was constructively discharged after reasonably concluding she would never receive a promotion at HCC.

195.    Jonathan Taylor - Race Discrimination Denied Promotion/Advancement /Income Loss/Retirement Loss — Mr. Taylor is currently employed at HCC and has over twenty (20) years of experience working there. He has been repeatedly overlooked for promotions, including in one instance when a Hispanic male with less experience and qualifications was given a position over Mr. Taylor. The excuse given by HCC for not promoting Mr. Taylor at the time was that he was not qualified for the position; however, the Hispanic male that was given the position had even

fewer qualifications than Mr. Taylor. The discrimination faced by Mr. Taylor began when his previous supervisor, Linda Compte, was removed from HCC and replaced by Sal Marroquin, a Hispanic male. Mr. Marroquin promoted the Hispanic male rather than Mr. Taylor. In January 2019, after facing persistent discrimination, Mr. Taylor filed a discrimination complaint against Sal Marroquin and Antonio Quintero. In May 2019, the findings of the investigation ruled in Mr. Taylor's favor, but no further action was taken by HCC to correct the racial discrimination Mr. Taylor is experiencing at HCC.

196.     Shiarnice Taylor Burns - Race Discrimination: Bullying/Harassment/Hostile Work Environment – Ms. Taylor is a current HCC employee and has been an adjunct faculty member in the Psychology and Student Success departments at the Central College since 2015. Since the inception of her employment at HCC, Ms. Taylor has been experiencing racial discrimination from her supervisor and other faculty. Her supervisor and department chair, Karen Saenz, a Hispanic female, continually discriminate against her because of her race. For example, Ms. Saenz often refers to Ms. Taylor as "Shaniqua" when speaking to her or about her to others. Ms. Saenz has also taken adverse employment action against Ms. Taylor by threats of termination and putting Ms. Taylor on a "bad debt" list, which prevented Ms. Taylor from being able to teach other departments. Ms. Taylor wanted to teach additional classes to supplement her income and teach classes for another department but only after pleading with the other department chair to allow her to do so and without any support from Ms. Saenz. Furthermore, in 2017 Ms. Taylor was on medical leave for foot surgery, and another Professor, Mr. Christopher Alas, a White male, taught Ms. Taylor's class and, in teaching that class, informed Ms. Taylor's class that she was, in fact, getting a gender reassignment surgery. Upon learning of Mr. Alas' statements, Ms. Taylor was horrified and complained to Ms. Saenz. After receiving Ms. Taylor's complaints, Ms. Saenz took no action

and did not reprimand Mr. Alas. Ms. Taylor insisted that corrective action be taken against Mr. Alas, in response to which Ms. Saenz became irate with Ms. Taylor and threatened Ms. Taylor with disciplinary action. Ms. Taylor has also faced challenges in securing a full-time teaching position at HCC. Ms. Taylor is also subjected to more scrutiny than other non-Black faculty, including Ms. Saenz personally reviewing Ms. Taylor's syllabus every semester but not conducting the same review for White and Hispanic faculty.

197.    Crystal Thomas - Race Discrimination Denied Promotion/Advancement/Income Loss/Retirement Loss —Ms. Thomas has been employed by HCC since 2003 in various positions, some being part-time. On November 19, 2008, she accepted a position as a full-time employee, working as an Enrollment Assistant (Student Services) at North East Northline Campus. She was chosen to work at the NE Pinemont location due to the HCC "Transformation" implemented by Chancellor Maldonado. Ms. Thomas was one of the lowest paid employees in Admissions, even though some employees had no degrees, such as Eva Arismendez, a Hispanic employee in the Admissions department. Ms. Thomas' Performance Excellence Program Evaluations (PEPE) have been good-to-exemplary over her 12-years at HCC. To date, she is still the lowest paid Enrollment Assistant even though she has a more robust educational background. Ms. Thomas also applied for the Advising Manager position. Although she was clearly qualified, two Hispanic females, lva Guzman and Laura Valdez, both with less experience than Ms. Thomas, were selected along with one Hispanic male (Alejandro Davalos Ospina) also with less experience. It was rumored that Mr. Ospina received his position due to his personal connection with Former Associate Dean Martin Perez. Martin Perez also took the initiative of prepping/ cross-training Alva Guzman and Laura Valdez even while Ms. Valdez finished up her degree, whereas Ms. Thomas had already received her degree and would have required minimal preparation or training, if any. Another Hispanic

female, Frances Pollo, was also selected for a position at the HCC SE Campus.

198.    Brenda Tillis-Allen - Race Discrimination: Wrongful Termination—The Chancellor began speaking publicly of a district-wide transformation within a year of his appointment.  Dr. Christina Robinson later sent out mass emails stating a layoff would be coming within the year. Ms. Allen was scheduled to be laid off on June 30, 2018. Then another email stated the date change and the new effective layoff date would be July 2018. The date change was to accommodate the workload and workforce that was needed for the enrollment period. Once HCC had squeezed every last drop of work out of Ms. Allen, she was terminated. During this time, Dr. Robinson was requesting employees to utilize all of their vacation time, a scheme so that HCC would not have to compensate these transformed employees any more than they were required. They were also giving the employees "compensation time" in lieu of overtime pay. For example, if an employee worked 50 hours in a particular week, rather than being given 10 hours of overtime pay, the employee would earn 10 hours to count towards their vacation time. Throughout the transformation period, Ms. Allen had begun taking on the requirements of a Program Assistant. Although she was ably handling the duties, while she was out on FMLA leave, she was told by Dr. Robinson that she would need to reapply for the position along with everyone else so that everyone could stand a fair chance. Due to the transformation, Ms. Allen was treated unfairly and was made an easy target for the lay-off. It appeared only certain staff were handpicked for layoffs, the majority of them being  Black, including Ms. Allen.

199.    Godwin Unuigbokhai - Racial Discrimination: Denied Promotion/ Advancement/ Demotion/Income Loss/Retirement Loss—Mr. Unuigbokhai has been working at HCC for over 21 years. He held the position of Manager Technical Support position for more than eight years in HCC IT, including many years in other positions and holds a master's degree in Information

Technology. He was told in a letter that the position he held would no longer exist as a result of "transformation." At the time this letter was presented to him in the presence of an HR representative (Satrice Morris), the new Campus Technology Services lead (Regional Manager) positions had already been filled while being advised to apply. Fortunately, he did apply for the Regional Manager Campus Technology Services position, which is equivalent to the Manager Technical Support position in functions that he held at the time the positions were still open.  He was told that he would not be considered for an interview nor offered a position. Instead, one of the three Regional Manager Campus Technology Services positions was offered to a Hispanic who had no experience in the functions or duties of the position. The announcement of his new position identified his background in IT Project Management which is not directly related to the functions of the position he has been offered. In essence, he was demoted and now holds a Senior Technician position—a position that used to report to him.

200.    LaQuinta Vargas - Race Discrimination: Pay Disparity—Ms. Vargas is a current HCC employee and works as an Academic Advisor and Adjunct Professor. Ms. Vargas has been a loyal and dedicated employee. However, her Hispanic supervisors have made it difficult for Ms. Vargas to fulfill her duties without feeling threatened, bullied, and worried about her job security. Ms. Vargas and other coworkers have faced constant scrutiny from their Hispanic supervisors, with reprimands for minor infractions.        Other Hispanic and White employees are not treated as harshly, if at all.

201.    Alyssa Wallace - Race Discrimination: Denied Promotion and Advancement/ Demotion/Income Loss/Retirement Loss—Ms. Wallace is a police officer within the Houston Community College Police Department. She has been an officer at HCC since July of 2019. Ms. Wallace has been an exemplary employee and has obtained all necessary and additional

certifications to perform her duties well and above reproach. Nevertheless, similar to other Black police officers employed at HCC, she is severely underpaid for the same position and duties that other White and Hispanic officers are paid. Specifically, a Hispanic officer with similar qualifications to Ms. Wallace was hired around the same time. The Hispanic officer, Jennifer Montieo, was onboarded with a starting salary of nearly $10,000 more than Ms. Wallace. More alarming, Ms. Wallace was forced to patrol HCC without all of the necessary equipment required by an officer to do their job safely and effectively. She was not provided with a taser until December 2019, only after a more senior Black officer forced the department to issue her one. No reason was ever provided to Ms. Wallace as to why she would be endangered this way. Ms. Wallace and other similarly situated Black officers at HCC have continuously brought the pay disparity issue to their supervisors' and HR's attention. To date, no action has been taken by HCC to ensure that these dedicated officers are paid equal or comparable to their White and Hispanic counterparts. Ms. Wallace has continued to be intimidated and abused by her superiors and faced unwarranted disciplinary actions. Regarding the present lawsuit, Ms. Wallace and other Black police officers have been threatened with termination if they participated in this lawsuit by their supervisors.

202.    Germaine Washington - Ms. Washington has worked at HCC as a Manager of Conference Services for the last five (5) years. She has been refused the title and compensation paid to directors even though she handles and performs the duties of a director. Even when a recent directorship opened up, she was told by her supervisor that she would not be allowed to assume the position even though she was the best qualified and already doing the work of the director. In addition, instead of bestowing on her the title for the job functions she was performing, she was told that HCC would be willing to pay her a stipend for the work, but not bestow on her the title.

Thus, even though she handles and performs the same tasks and responsibilities as other non-Black directors, she is the only employee required to maintain the title of manager and s lower P9 job classification instead of a P10 rating like the other non-Black directors. Also, after being disclosed, Ms. Washington has suffered harassment and retaliatory actions from the same person who discriminated against another Black HCC employee, the lead plaintiff named in another racial discrimination lawsuit against HCC. That person is HCC supervisor Maya Durnovo. Below are but a few examples of the treatment Ms. Washington has had to endure at the hands of Ms. Durnovo:

a.   January 11, 2021 – Ms. Washington's work on projects was omitted from the departmental binder—a report prepared by Durnovo to show completed work on behalf of HCC. Despite several significant projects Ms. Washington had successfully completed, her work was the only employee's work under Durnovo that had been omitted. It was only after another supervisor, Brenda Rios, inquired as to why Ms. Washington was not mentioned anywhere in the report that Durnovo had to correct the omission. Such exclusion of Ms. Washington's work had not previously been done.

b.   January 28, 2021 – Ms. Durnovo sent an e-mail instructing Ms. Washington to begin performing clerical tasks like keeping the calendar of events even though Ms. Washington was a management-level employee. Such tasks are customarily reserved for administrative staff, like secretaries, not managers at Ms. Washington's level, and the fact that Ms. Washington was tasked with performing such clerical work is also noteworthy in that Ms. Washington holds an MBA – a degree not associated with being tasked to perform such duties at HCC.

c.   February 1, 2021 – Ms. Durnovo informed the rest of her staff that she had assigned

Ms. Washington to maintain the calendar. Recognizing such an assignment to be demeaning to Ms. Washington, another colleague at the meeting spoke up regarding Ms. Washington's demotion in duties. Ms. Durnovo is said to have later chastised that employee for speaking out against her wrongful actions directed at Ms. Washington. Later, another supervisor, recognizing that Durnovo's actions were inappropriate, advised Ms. Washington that the task of calendaring was not in Washingon's job duties—which was correct—-however, Washington continued to prepare and work on maintaining the calendar so that it could not be used against her by Ms. Durnovo. Such conduct evidences disparate treatment of Ms. Washington by Ms. Durnovo.

d.      Friday, February 5, 2021 – Ms. Washington received an email with a false disciplinary write-up by Ms. Durnovo. In that write-up, Ms. Durnovo wrongly accused Ms. Washington of not doing the calendar—a task she was given only a few days earlier,—and of not accepting additional duties to work at the Northeast campus. Both of these charges were false. Ms. Durnovo claimed that Ms. Washington declined to take on additional duties relating to the Center of Entrepreneurship when in actuality, it was Ms. Durnovo who instructed Ms. Washington not to meet with the President about those new duties. In an earlier email, dated December 9th, 2020, Ms. Durnovo had informed Ms.Washington that she should not meet with the President of the Northeast Campus regarding the Entrepreneur Program Development purportedly because Ms. Washington did not want to work outside of her job description. This was a manufactured untruth. Ms. Washington was able and willing to accept the additional duties if she was also fairly compensated for the additional job duties like other employees. Indeed, Ms. Washington volunteered to work at the Northeast campus when the staff determined that a Director position for that area was

needed. At first, Ms. Durnovo told Ms. Washington to move forward with the duties even after Ms. Washington asked Ms. Durnovo to first obtain approval from HCC's HR Department to ensure the position was in fact available. Upon learning that the position was not approved by HR, Ms. Durnovo told Ms. Washington that she could still perform the additional duties without being promoted to a Director position and rather was only eligible for a stipend. No other non-Black employee/colleague under Ms. Durnovo has been required to work under such conditions. All other employees doing the level of work being completed by Ms. Washington hold the title of Director and are paid increased amounts to conform with the workload. Only Ms. Washington is being held to a different and unfair compensation standard.

e.     Ms. Washington is experiencing the same type of discriminatory practices as another Black female experienced at HCC—i.e., experiencing HCC's all too familiar "padding" of Black employees' personnel files in preparation for terminating the employees. Hispanic employee infractions, even when true, are overlooked or downgraded. Ms. Durnovo is now using this same tactic against Ms. Washington in retaliation for being associated with this litigation.

203.     Frederica Watson - Race Discrimination: Denied Promotion/ Advancement/ Demotion/Income Loss/Retirement Loss—Ms. Watson was employed with HCC from 1998 until her "transformation" in 2020 and had worked in various positions at HCC, mainly in the Accounting Department. Ms. Watson was the only person (a 60+-year-old Black female) in the Accounting Department that has been selected to be terminated in the entire 2020 Accounting "Transformation." Throughout her years in HCC's accounting department, specifically after the arrival of Janet May and Cesar Maldonado, she has personally witnessed and been the subject of

multiple instances of racial discrimination. She has witnessed many other Black employees being scrutinized, investigated, demoted, transformed, and terminated for no justifiable reasons; while White and Hispanic coworkers have little to fear. Throughout her tenure as the Executive Director of Tax and Finance, her superiors have levied false accusations against her in attempts to set her up for termination. When those efforts proved fruitless, she was targeted for transformation. After being "transformed," she applied for the Executive Director of Accounting position in August 2020, and HCC pretextually extended her termination date to September 30, 2020 to allow for the interview process to occur. Some individuals familiar with the interview process have advised that Ms. Watson was the best candidate and should have received the position but because upper-level management would not agree, HCC postponed the selection of the position outright. This is just a stall tactic to ensure her departure/forced retirement/constructive discharge before selecting someone else for the position. If her original position were truly eliminated based on factors other than age and race, one would think she would be awarded the Executive Director of Accounting position as she was and is clearly the most qualified. Instead, HCC continues to demonstrate that the true reasons for her "transformation" were due to race/age bias and discrimination.

204.     Donna Williams - Race Discrimination: Wrongfully Terminated—On September 4, 2018, Ms. Williams was called into a meeting with Dr. William Tapp; Indra Pelaez, Dean of Student Success; Barbara Ramirez, Director TRIO Upward Bound; and Deborah Decoteau, Administrative Assistant, TRIO Upward Bound. Ms. Williams was told verbally that the budget could no longer support her position of Advisor Pathways Case management and that as of November 15, 2018, her position would be terminated. She was told that she was welcome to re-apply for the position, but she was not guaranteed to be hired. Ms. Williams left the position on November 15, 2018, as scheduled. She later spoke to Deborah Decoteau, Administrative Assistant

TRIO Upward Bound, in December of 2018. In that conversation, Ms. Williams found out that a person had been hired in the same position at the HCC Southeast Campus. The person hired was of Hispanic ethnicity. Her name is Luisa Rochez. On August 16, 2019, Xavier Barreda, a Hispanic former student in the Upward Bound program and new Prairie View A&M University Graduate, was hired in the position of Advisor Pathways and Case Management at Houston Community College Southeast Campus. Although it was claimed that Ms. Williams was being terminated due to lack of funds, the hiring of many Hispanic employees in her stead after she was terminated, clearly reveals that was not true and that race was most likely the reason for Ms. Williams' removal. Moreover, the program is a federally-funded by grant funds, and the grant funds had just been renewed for five years.  Thus, the funding was present, HCC just wanted to rid itself of another Black employee—Ms. Williams.

205.    Tina Young - Race Discrimination: Harassment/Retaliation—Ms. Young is a current HCC employee and has been there for more than twenty (20) years. Ms. Young is currently working at the Southeast Campus and has consistently received exemplary performance ratings on her employee evaluations. During her time at HCC, Ms. Young has witnessed widespread racial discrimination against Black employees at HCC, and she has filed several discrimination complaints over the years against HCC, including a grievance against the White male Director of Talent Engagement, Tom Anderson, in which she was successful. Due to her filed grievances, Ms. Young has also been prevented from seeking a higher, executive-level position due to her race and complaints against racial discrimination. In 2019, Ms. Young applied for an executive position and was a finalist but did not get the position. Despite being the more qualified and experienced candidate, the position was given to a lesser qualified White female. Ms. Young was not notified that she was not being offered the executive position. She currently has a complaint against a

Hispanic female, Ms. Sandra Martinez, for violating HCC employee standards of conduct and that complaint is currently under investigation by HCC and an external investigator. Ms. Martinez is a close associate of Mr. Maldonado and others in the HCC administration. Ms. Young is one of the few Black administrators remaining at the Southeast campus, and, thus, Ms. Young has been forced to aggressively pursue and resist all attempts to have her terminated or removed from her current position. Ms. Young's grievance against Ms. Martinez was improperly conducted by the HR Department at HCC, in violation of the standards and policies promulgated by HCC, which resulted in Ms. Young appealing her grievance. Ms. Martinez has a reputation for being "exacting and aggressive" under the auspices of representing the "President's Office," this was further confirmed by the report of Renee Mack, Manager of the Equal Employment Opportunity & Training, in her investigation of Ms. Young's grievance against Ms. Martinez. Therefore, Ms. Martinez is acting under apparent authority from Mr. Maldonado's office to harass and discriminate against Ms. Young.

### D.   Blocked or Asleep at The Controls"

206.   All named Plaintiffs have suffered the sting of HCC's clearly retaliatory, discriminatory, and racially offensive conduct. HCC's policies expressly authorized appeals to its Board of Trustees—and there have been many by Black employees since Maldonado has been chancellor.  However, HCC's Board of Trustees has chosen not to reasonably address or correct what has repeatedly happened to the Black Plaintiffs.  And, with clear knowledge of these appeals, the Board has chosen not to correct obvious wrongs.  As such, HCC's Board has knowingly ratified the offensive and discriminatory conduct occurring at the College, including the systemic pattern, practice, policies, and custom of the College's Displacement Plan for Blacks. Additionally, the Board has delegated to Maldonado and his henchmen the final decision-making authority relating

to the firings, displacements, retaliations, and racial discrimination against Black employees alleged in this case.

## V.
### CLASS ACTION ALLEGATIONS

207.    Plaintiffs seek to represent the following Class of individuals: all Black Americans who were or continue to be employed by the College from January 1, 2016, through the filing date of the original petition in this litigation and who have had an adverse employment action imposed upon them by the College in violation of Section 1981.[7]

208.    Excluded from the Class are the College's officers, directors, and trustees, as well as the Court and its personnel working directly on this case.

209.    Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Federal Rule of Civil Procedure 23 for the following reasons:

a.    The prerequisites for a class action under Federal Rule of Civil Procedure 23(a) are met.  The Class is so numerous that joinder of all persons is impracticable. As many as 100+ Black employees were adversely affected by the College's discriminatory conduct based on race.  The number of Class Members may be better estimated as the litigation progresses.

b.    There are common issues of law and fact, including but not limited to:  (1) whether the College decision-makers created a deliberate general policy for targeting, demoting, disciplining, and discharging Black employees; (2) whether

---

[7] The term "adverse employment action" includes termination of employment or discharge (whether express or constructive), demotion, reduction in salary, involuntary administrative leave (whether paid or unpaid), unwarranted administrative investigations, reduction in job responsibilities, reassignment to menial or degrading work, reassignment to work under a younger or less experienced supervisor, badgering, harassment, or humiliation by the employer reasonably calculated to encourage the employee's resignation, offers of early retirement (or continued employment) on terms less favorable than the employee's former status, or any other action constituting a hostile work environment.

the College engaged in a general policy, pattern and practice of replacing Black employees with less qualified Hispanic and White employees; (3) whether these actions were the result of a *de facto* and/or intentional policy of racial discrimination; and (4) whether the College is liable for damages to the Class for discriminatory conduct based on race in violation of 42 U.S.C. Section 1981. These and other common issues of law and fact relate to and affect the rights of the named Plaintiffs and the Plaintiff Class Members. Because these issues relate to the College's high-level, general policy and practice towards employment decisions, they are capable of resolution through common evidence. Plaintiffs' common proof of the College liability will involve the same cast of characters, the same policymakers, the same events, discovery, documents, fact witnesses, and experts.

c.      Plaintiffs' claims are typical of the Class. Plaintiffs are all victims of the College Displacement Plan outlined above. Like other putative class members, they were targeted, investigated, exposed to objectively false allegations, harassed, and ultimately suffered multiple adverse employment actions because of their race. Plaintiffs suffered emotional harm and economic injury typical of the putative Plaintiff Class Members. Their interests are identical to and aligned with those of other Class Members. Plaintiffs and the Class Members have suffered an array of recoverable damages, all stemming from the common trunk of facts and issues related to the racially discriminatory policies, practices, and customs at the College. Those damages will be further detailed as the case progresses, including but not limited to front pay, back pay, compensatory damages, and punitive damages.

210.    Plaintiffs will fairly and adequately represent and protect the interests of the Class

because:

      a.      Plaintiffs have retained seasoned counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the Class;

      b.      Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and putative Class Members or that otherwise cannot be managed through the implementation of available procedures;

      c.      Plaintiffs, through their counsel, have adequate financial resources to assure that the interests of the Class will be protected; and

      d.      Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this case.

211.    Further, a class action may be maintained under Federal Rule of Civil Procedure 23(b)(2) because the party opposing the Class is the same and has acted and/or refused to act on grounds that generally apply to the Class, such that final injunctive relief is appropriate respecting the Class as a whole.

212.    A class action may also be maintained under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over those issues that might pertain to individual cases.  The predominant issue, in this case, is whether the College and its decision-makers acted pursuant to a discriminatory general pattern and practice of targeting Black employees, disparately disciplining Black employees, and disproportionately replacing them with Hispanic and White employees since Maldonado has been chancellor.  The interests of all members of the Class in establishing the liability of the College for discriminatory conduct based on race are cohesive.

213.    The need for proof of Plaintiffs' and Class Members' damages will not cause

individual issues to predominate over common questions. Damages consistent with each of the categories of damages can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types and elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

214.     A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arising out of the conduct of the same Defendant and under the same circumstances, policies, policymakers, course of conduct, pattern, and practices. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members, manage recovery and permit distribution of any recovery. A class action also allows the Court to process all rightful claims in one proceeding. It is impracticable and risks conflicting judgments to force more than 100+ Class Members to litigate claims individually, with each Plaintiff conducting duplicative discovery and ultimately having to prove the existence of the same elements in diverse cases. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the Class, should that be determined to be appropriate.

215.     The conduct of this action as a class action also conserves the resources of the parties and the court system, protects the rights of each member of the Class and the Defendant, and meets all due process requirements.

216.     Certification of the Class with respect to particular common factual and legal issues concerning liability and affirmative defenses, as well as the necessary and appropriate quantum of

punitive damages, or ratio of punitive damages to actual harm, is also appropriate under Federal Rule of Civil Procedure 23(c)(4).

## VI.
## CAUSES OF ACTION

217.    Plaintiffs re-urge by reference all the allegations contained above and assert the following causes of actions against the Defendant named in this suit as specified below:

### VIOLATION OF 42 U.S.C. § 1981 AND 42 U.S.C. § 1983

218.    This claim is brought on behalf of all Plaintiffs in their individual capacity and as representative(s) of the Plaintiff Class.

219.    HCC intentionally and/or deliberately engaged in the aforementioned practices, policies, customs, and actions which are unlawful under 42 U.S.C. § 1981 and actionable under 42 U.S.C. § 1983.

220.    Plaintiffs are (1) members of a recognized racial minority, (2) there was an intent to discriminate against them and the Plaintiff Class on the basis of their race by the College; and (3) the alleged discrimination concerns one or more of the activities enumerated in § 1981.

221.    The College has engaged in a system and custom of policies, practices, and pattern of conduct under color of law that has damaged Plaintiffs and the Plaintiff Class with discriminatory and retaliatory intent.   As a part of this scheme, the College regularly creates pretextual and often objectively false justifications for its adverse actions against Plaintiffs and the Plaintiff Class.  This scheme both constitutes disparate treatment and creates a disparate impact on Plaintiffs and members of the Plaintiff Class.

222.    Plaintiffs were retaliated against in violation of 42 U.S.C. Section 1981 as enforced under 42 U.S.C. § 1983. the College's retaliation against Plaintiffs was part of a broad custom, policy, pattern, and practice of retaliation against its Black employees.  Specifically, Plaintiffs

engaged in protected activity by complaining about the exclusion of Blacks from their regular or authorized duties and in complaining about the systematic targeting and investigation of Black employees. The College acted adversely against Plaintiffs under color of law, and the adverse action was taken because of Plaintiffs' protected activity.  A reasonable employee would have found the challenged action materially adverse, and the challenged action would have dissuaded a reasonable worker from engaging in the protected activity.

223.    As a result of their protected status and actions under 42 U.S.C. § 1981, Plaintiffs suffered adverse employment actions, including but not limited to being investigated, harassed, falsely accused, made to agree to false charges,  being written up, and ultimately, constructively discharged from their employment or job functions.  In other instances, they were denied career advancement opportunities because of their race.  The working conditions were so intolerable and hostile that Plaintiffs could not reasonably be expected to endure the working environment and situation, thereby forcing them to resign or tolerate being discriminated against just to keep their employment.  Plaintiffs seek damages exceeding $50,000,000.00, and the Class Members each having compensatory and punitive damage claims exceeding an additional $50,000,000.00.

## VII.
### JURY DEMAND

224.    Plaintiffs demand a jury trial.

## VIII.
### ATTORNEYS' FEES

225.    HCC's actions and conduct as described herein, and the resulting damages and losses to Plaintiffs, have necessitated Plaintiffs retaining the services of lawyers and law firms listed below to investigate, initiate, and prosecute the claims in this lawsuit.  Plaintiffs seek recovery of reasonable and necessary attorneys' fees under 42 U.S.C. § 1988 and any other

applicable law or statute, as well as expenses, court costs, and expert witness fees.

## IX.
### PRAYER AND DAMAGES

226.     As a direct and proximate result of the Defendant the College conduct, Plaintiffs seek judgment against the College for their damages suffered in the following particulars:

      a.   Lost wages in the past and future;

      b.   Lost health insurance and related benefits in the past and future;

      c.   Loss of pension and/or retirement benefits;

      d.   Emotional suffering in the past and future;

      e.   Stigma damages;

      f.   Mental anguish damages;

      g.   Punitive damages;

      h.   Attorneys' fees, costs, and expenses;

      i.   All equitable, injunctive, and declaratory relief to the extent allowed in law or at equity to which Plaintiffs and the Plaintiff Class may show themselves justly entitled;

      j.   Plaintiffs also seek certification of a Class as identified above, or as the evidence may support;

227.     Plaintiffs assert their individual compensatory damages are between $1,000,000.00 and $2,500,000.00 each; and punitive damages;

228.     Additionally, if a class is certified, Plaintiffs believe there will be more than 100+ members of the class and that the class members' collective damages, compensatory and punitive, will exceed $100,000,000.00, inclusive of costs, fees, and punitive damages.

229.     Finally, Plaintiffs seek injunctive relief against the College to enjoin its

discriminatory practices against Black employees.  The College must be permanently enjoined from discriminating against Black candidates and employees in hiring, disciplining, and termination decisions.

Respectfully submitted,

**The HALL LAW GROUP, PLLC**


*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
Federal Bar No. 8787
bhall@bhalllawfirm.com
**William L. Van Fleet II**
State Bar No. 20494750
Federal Bar No. 3670
bvfleet@comcast.net
THE HALL LAW FIRM
530 Lovett Blvd.
Houston, Texas 77006
Telephone:  (713) 942-9600
Facsimile:  (713) 942-9566

-AND-

**The HITTNER GROUP, PLLC**

**George J. Hittner**
State Bar No. 24038959
S.D. TX No. 431901
george.hittner@thehittnergroup.com
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

-AND-

**The VILLACORTA LAW FIRM, P.C.**

**Adrian V. Villacorta**
State Bar No. 24003111
530 Lovett Blvd.
Houston, Texas 77057

Telephone: (832) 991-8864
Facsimile: (832) 201-7469
avillacorta@avvlaw.com

-AND-

**JIMMY ARDOIN & ASSOCIATES, PLLC**

**James Ardoin**
State Bar No. 24045420
S.D. TX No. 571281
4900 Fournace Place, Suite 550
Houston, Texas 77401
Phone: (713) 574-8900
Toll Free: (888) 701-8509
Email: jimmy@jimmyardoinlaw.com

-AND-

**Ahmad, Zavitsanos, Anaipakos,
Alavi & Mensing, P.C.**

Joseph Y. Ahmad
Texas Bar No. 00941100
S.D. Tex. Bar No. 11604
Jordan Warshauer
Texas Bar No. 24086613
S.D. Tex. Bar No. 2994699
Edward B. Goolsby
Texas Bar No. 24092436
S.D. Tex. Bar No. 2505570
Nathan B. Campbell
Texas Bar No. 24097455
S.D. Tex. Bar No. 2745040
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
Fax: (713) 655-0062
joeahmad@azalaw.com
egoolsby@azalaw.com
jwarshauer@azalaw.com
ncampbell@azalaw.com

**ATTORNEYS FOR PLAINTIFFS**